1  [Counsel Listed on Signature Page]

2  **IN THE UNITED STATES DISTRICT COURT**
3  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
   **SAN FRANCISCO DIVISION**

4  IN RE NETFLIX ANTITRUST                    No. C 07-00643 WHA
   LITIGATION
5                                             **PLAINTIFFS' OPPOSITION TO**
   This Document Relates To:                  **DEFENDANT'S MOTION TO**
6  C 07-00643                                 **DISMISS**
   C 07-01266
7  C 07-00643

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Table of Contents

Page

I.   **Consumers Have Standing for *Walker Process* Claims Under Applicable Ninth Circuit Law** ..............................................................................................1

    A.   Plaintiffs Have Antitrust Standing ...............................................................2

        1.   Plaintiffs Allege Antitrust Injury .............................................3

        2.   Plaintiffs Allege the Other Elements of Antitrust Standing ...................4

    B.   Defendants Advance No Reason to Rebut Presumption of Consumer Antitrust Standing.............................................................................................6

        1.   The Supreme Court Rejected Essentially the Same "Remoteness" Argument Advanced By Netflix ................................................6

        2.   Netflix's Consumer *Walker Process* Cases Are Inconsistent With the Antitrust Standing Analysis Applied in the Ninth Circuit.......................6

    C.   Sound Competition Policy Requires Consumer *Walker Process* Claims to Counterbalance Widespread Abuse of Potent Patent Rights ...............................8

II.  **Plaintiffs Properly Allege A *Walker Process* Claim**...................................................10

    A.   Plaintiffs' Claims Hinge on the Deterrence and Restraint of Competition ........12

    B.   Plaintiffs Alleged That the Netflix Patents Deterred Competitors ....................15

    C.   To the Extent Rule 9(b) Applies, Plaintiffs' Allegations That Netflix Deterred Competition Suffice........................................................................16

        1.   Rule 9(b) Does Not Apply to Plaintiffs' Allegations That Netflix Deterred Competition ........................................................17

        2.   Rule 9(b) Does Not Bar Claims Where the Information Needed to Be Alleged With Specificity Is Not Available to the Plaintiffs....................17

# Table of Contents

**Page**

**III.** **Plaintiffs State Unfair Competition and Cartwright Act Claims** ............................19

    A.    Patent Law Does Not Preempt Plaintiffs' California Law Claims ....................20

    B.    California's Litigation Privilege Does Not Apply to Communications Alleged in the Complaint ....................................................................................................21

        1.    The Litigation Privilege Does Not Apply to Third Parties Like Plaintiffs ......................................................................................22

        2.    The Litigation Privilege Does Not Apply Unless Netflix Can Prove Its Litigation Threats Were Sent in Connection With Seriously, Sincerely Contemplated Litigation ....................................................22

    C.    Complaint Adequately Alleges Trust Sufficient to State Cartwright Act Claim ............................................................................24

        1.    Ninth Circuit Jurisprudence Recognizes Antitrust Conspiracy Between Defendant and its Counsel ....................................................24

        2.    The Complaint Adequately Alleges a Combination Between Netflix and its Competitors ..........................................................................25

**Table of Authorities**

**Federal Cases**                                                                                            **Page**

*Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006)..........................8

*Agron, Inc. v. Chien-Lu Lin*,
    No. 03-05872, 2004 U.S. Dist. LEXIS 26605 (C.D. Cal. Mar. 16, 2004)....................7

*Amarel v. Connell*, 102 F.3d 1494 (9th Cir. 1996)..........................................................3, 5, 24

*Am. Ad Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051 (9th Cir. 1999)...................1-2, 3, 5, 18

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001) ...........................4-5

*Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006) ...........................................17

*Arenson v. Whitehall Convalescent & Nursing Home*,
    880 F. Supp. 1202 (N.D. Ill. 1995) ......................................................................18 n. 14

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) .................................................................................................1, 5

*Asahi Glass Co. v. Pentech Pharms., Inc.*, 289 F. Supp. 2d 986 (N.D. Ill. 2003)................7 n.3

*Atl. Richfield Co. v. U.S. Petrol. Co.*, 495 U.S. 328 (1990) .................................................5

*Bell Atlantic Corp. v. Twombly*, No. 05-1126, 2007 U.S. LEXIS 5901 (May 21, 2007)..........16

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999) ......................5

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)........................................................3, 6

*Bosse v. Crowell Collier & MacMillan*, 565 F.2d 602 (9th Cir. 1977) ...................................17

*Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704 (9th Cir. 2003) ...........................................8

*Bradburn Parent/Teacher Store v. 3M*,
    No. 02-7676, 2004 U.S. Dist. LEXIS 16193 (E.D. Pa. Aug. 17, 2004) ......................11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ....................................2

*Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261 (7th Cir. 1984)...............................13

*Cal. E. Labs., Inc. v. Gould*, 896 F.2d 400 (9th Cir. 1990)........................................15 n.12

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986).........................................6

*Carrot Components Corp. v. Thomas & Betts Corp.*,
    No. 85-5133, 1986 U.S. Dist. LEXIS 29723 (D.N.J. Feb. 11, 1986)..............7-8 nns.3, 4

*Chip-Mender, Inc. v. Sherwin-Williams Co.*,
    No. 05-3465. 2006 U.S. Dist. LEXIS 2176 (N.D. Cal. Jan. 3, 2006)...................15 n.12

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988)....................................7 n.2

**Table of Authorities**

**Federal Cases**                                                                                    **Page**

*Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041 (7th Cir. 1998) ........................................18

*Doe v. Abbott Labs.*,
    No. 04-1511, 2004 U.S. Dist. LEXIS 29129 (N.D. Cal. Oct. 21, 2004) .................11-12

*Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470 (Fed. Cir. 1998) ...................................9, 20-21

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) ......................................................10-11 n.8

*EMC Corp. v. Storage Tech. Corp.*, 921 F. Supp. 1261 (D. Del. 1996)..............................16-17

*F.B. Leopold Co., Inc. v. Roberts Filter Mfg Co.*, 882 F. Supp. 433 (W.D. Pa. 1995) ..............24

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) ................................24

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001)....................................................11

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485 (2d Cir. 2004).................11 n.10

*Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367 (9th Cir. 2003) .......................2, 3, 4, 7

*Gopp v. Legion Ins. Co.*,
    No. 01-539, 2001 U.S. Dist. LEXIS 14811 (N.D. Cal. Sept. 10, 2001).......................23

*Goss Int'l Ams., Inc. v. MAN Roland, Inc.*,
    2006 DNH 62, 2006 U.S. Dist. LEXIS 36386 (D.N.H. June 2, 2006)........................14

*Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ................................1, 5, 12

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738 (1976).............................................18

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005)................4

*Hunter Douglas, Inc. v. Harmonic Design*, 153 F.3d 1318 (Fed. Cir. 1998) ....................13, 20

*Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344 (Fed. Cir. 2007)....................7, 12, 14 n.11

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)....................................................5

*Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997).............................10

*Indium Corp. of Am. v. Semi-Alloys Inc.*, 591 F. Supp. 608 (N.D.N.Y. 1984),
    *aff'd* 781 F.2d 879 (Fed. Cir. 1985) .........................................................8, 13

*In re Buspirone Patent & Antitrust Litig.*, 185 F. Supp. 2d 363 (S.D.N.Y. 2002)......................8

*In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003) .................................3-4, 8

*In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000).................2, 4 n.1

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
    363 F. Supp. 2d 514 (E.D.N.Y. 2005) ......................................................7 n.3, 9

**Table of Authorities**

**Federal Cases**                                                                     **Page**

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
    691 F.2d 1335 (9th Cir. 1982) ................................................................10 n.7

*In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-2237 (S.D.N.Y. Nov. 2, 2006) .......8 n.4

*In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005 (S.D. Cal. 2006) ................10-11 n.8

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
    No. 04-1628, 2005 U.S. Dist. LEXIS 6825 (S.D.N.Y. Apr. 20, 2005) .................21 n.17

*In re K-Dur Antitrust Litig.*, No. 01-1652 (D.N.J. Mar. 1, 2007) .........................................8 n.4

*In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 344 (D. Mass. 2003)...............................4 n.1, 8

*In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522 (D.N.J. 2004) ..........................7 n.3, 8 n.4

*In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198 (3d Cir. 2002)......................................19

*In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751 (E.D. Pa. 2003) .....................8

*In re Wellbutrin SR Antitrust Litig.*,
    No. 04-5525, 2006 U.S. Dist. LEXIS 9687 (E.D. Pa. Mar. 9, 2006)...........................19

*In re Wells Fargo Sec. Litig.*, 12 F.3d 922 (9th Cir. 1993) ......................................................17

*K-Lath, Inc. v. Davis Wire Corp.*, 15 F. Supp. 2d 952 (C.D. Cal. 1998).........................15 n.12

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) .............2-3, 5-6, 19, 25

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir. 1998) ..........11

*MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007).....................................................14

*Meram v. MacDonald*,
    No. 06-1071, 2006 U.S. Dist. LEXIS 79069 (S.D. Cal. Oct. 23, 2006).......................17

*Merch. Techs., Inc. v. Telefonix, Inc.*,
    No. 05-1195, 2007 U.S. Dist. LEXIS 9266 (D. Or. Feb. 7, 2007).......................15 n.12

*MGA Entm't, Inc. v. Mattel, Inc.*,
    No. CV 05-2727, 2005 U.S. Dist. LEXIS 18594 (C.D. Cal. Aug. 26, 2005) ...............23

*Molecular Diagnostics Labs. v. Hoffmann-La Roche, Inc.*,
    402 F. Supp. 2d 276 (D.D.C. 2005) .........................................2, 7, 9-10, 12

*Moore v. Kayport Package Express*, 885 F.2d 531 (9th Cir. 1989)............................................18

*Netflix, Inc. v. Blockbuster, Inc.*,
    No. 06-2361, 2006 U.S. Dist. LEXIS 63154 (N.D. Cal. Aug. 22, 2006) .................1, 16

*Nobelpharma Ab v. Implant Innovations*, 141 F.3d 1059 (Fed. Cir. 1998).............................20

**Table of Authorities**

**Federal Cases**                                                                            **Page**

*Oahu Gas Serv., Inc. v. Pac. Resources, Inc.*, 838 F.2d 360 (9th Cir. 1988)....................11 n.10

*Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024 (9th Cir. 1989)...............................................24

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)................................2, 11 n.10

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979)...................................................................3

*Reudy v. Clear Channel Outdoors, Inc.*,
     No. 02-5438, 2007 U.S. Dist. LEXIS 26322 (N.D. Cal. Apr. 4, 2007) .........................2

*Rohm & Haas Co. v. Dawson Chemical Co.*, 635 F. Supp. 1211 (S.D. Tex. 1986)................13

*Rolex Employees Ret. Trust v. Mentor Graphics Corp.*,
     749 F. Supp. 1042 (D. Or. 1990) ........................................................................18 n.14

*SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372 (Fed. Cir. 2007)...........................14

*SAS v. Puerto Rico Tel. Co.*, 48 F.3d 39 (1st Cir. 1995) ....................................................2

*Schering-Plough Corp. v. FTC*, 402 F.3d 1056 (11th Cir. 2005)..........................................9

*Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368 (Fed. Cir. 2000) .......21

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006)............................16, 22, 25

*Societe de Conditionnement en Aluminum v. Hunter Eng'g Co.*,
     655 F.2d 938 (9th Cir. 1981).................................................................................14

*Tillamook Cheese & Dairy Ass'n v. Tillamook County Creamery Ass'n*,
     358 F.2d 115 (9th Cir. 1966)..................................................................................24

*Toscano v. PGA*, 258 F.3d 978 (9th Cir. 2001).................................................................18

*Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918 (7th Cir. 1992) ..........................................18

*Unitherm Food Sys., Inc v. Swift-Eckrich, Inc.*, 375 F.3d 1341 (Fed. Cir. 2004)........2, 7, 13-14

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ................................11 n.10

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003).............................................17

*Walker Process Equip., Inc. v. Food Machinery & Chemical Corp.*,
     382 U.S. 172 (1965) .............................................................................................3, 9

*Wood v. Apodaca*, 375 F. Supp. 2d 942 (N.D. Cal. 2005)..................................................18 n.14

*Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999)..........................20 & n.16

*Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100 (1969)..........................................11

**Table of Authorities**

**Federal Statutes**                                                                                    **Page**

28 U.S.C. § 1331 (2007) .......................................................................................7 n.2

28 U.S.C. § 1332 (2007) .......................................................................................7 n.2

28 U.S.C. § 1295 (2007) .......................................................................................7 n.2

**California Cases**                                                                                    **Page**

*Am. Prods. Co., Inc. v. Law Offices of Geller, Stewart & Foley, LLP,*
    134 Cal. App. 4th 1332, 37 Cal. Rptr. 3d 93 (Cal. Ct. App. 2005).............................22

*Blanchard v. DIRECTV, Inc.,*
    123 Cal. App. 4th 903, 20 Cal. Rptr. 3d 385 (Cal. Ct. App. 2004)...............................23

*Cianci v. Superior Court,*
    40 Cal. 3d 903, 710 P.2d 375 (1985).......................................................................19

*Cellular Plus v. Superior Court,*
    14 Cal. App. 4th 1224, 18 Cal. Rptr. 2d 308 (Cal. Ct. App. 1993) ...........................19

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163, 973 P.2d 527 (1999) ...................................................................19

*Edwards v. Centex Real Estate Corp.,*
    53 Cal. App. 4th 15, 61 Cal. Rptr. 2d 518 (Cal. Ct. App. 1997)..................................23

*Flatley v. Mauro,* 39 Cal. 4th 299, 46 Cal. Rptr. 3d 606 (2006) .............................................22

*Fuhrman v. Cal. Satellite Sys.,*
    179 Cal. App. 3d 408, 231 Cal. Rptr. 113 (Cal. Ct. App. 1986)..................................23

*Kashian v. Harriman,*
    98 Cal. App. 4th 892, 120 Cal. Rptr. 2d 576 (Cal. Ct. App. 2002)..............................22

*Kolling v. Dow Jones & Co.,*
    137 Cal. App. 3d 709, 187 Cal. Rptr. 797 (Cal. Ct. App. 1982)..................................25

*Rubin v. Green,* 4 Cal. 4th 1187, 847 P.2d 1044 (1993) ...........................................22

*Silberg v. Anderson,* 50 Cal. 3d 205, 786 P.2d 365 (1990) ...........................................22, 23

**California Statutes**                                                                                 **Page**

Cal. Bus. & Prof. Code § 16720 (2007) ...............................................................19

Cal. Bus. & Prof. Code § 16726 (2007) ...............................................................19

Cal. Bus. & Prof. Code § 17200 (2007) ...............................................................19

Cal. Bus. & Prof. Code § 17204 (2007) ...............................................................21

Cal. Civ. Code § 47(b) (2007)...............................................................................21

**Table of Authorities**

**Miscellaneous**                                                                                    **Page**

Federal Trade Commission, To Promote Innovation: The Proper Balance of
    *Competition and Patent Law and Policy* (2003), *available at*
    http://www.ftc.gov/os/2003/10/innovationrpt.pdf ............................................9 nn. 5, 6

Plaintiffs respectfully file their Opposition to Defendant's Motion to Dismiss and state as follows:

Plaintiffs' designated consolidated Complaint ("Complaint") alleges *Walker Process* and related state law claims against Netflix, Inc. ("Netflix") for fraudulently obtaining U.S. Patent No. 6,584,450 (the "'450 Patent") and U.S. Patent No. 7,024,381 (the "'381 Patent") and deterring and delaying competition in the online DVD rental market (the "Market"). The Complaint incorporates each relevant allegation of Blockbuster Inc.'s ("Blockbuster") *Walker Process* claims for lost profits (presumably stemming from a delayed entry in the Market), which this Court refused to dismiss. *See Netflix, Inc. v. Blockbuster, Inc.*, No. 06-2361, 2006 U.S. Dist. LEXIS 63154, at *9-19 (N.D. Cal. Aug. 22, 2006).

Netflix's Motion to Dismiss ("Motion") erroneously contends that the Plaintiffs, as consumers, have no claims under these allegations. Netflix argues that: 1) consumers do not have antitrust standing to raise *Walker Process* Sherman Act claims; 2) Plaintiffs do not sufficiently allege that Netflix deterred competition; and 3) Plaintiffs do not state California-law claims. Plaintiffs estimate Netflix extracted over $60 million from the Class through its patents. Netflix urges that, even if Plaintiffs can prove that Netflix obtained these patents fraudulently and used them to deter competition, it *should have no liability on these profits whatsoever. Cf. Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968) (rejecting argument that would allow defendants to retain monopoly profits by eliminating standing for anyone who could bring suit to recover those profits). Netflix further urges that, because it did not threaten Plaintiffs with patent infringement litigation, Plaintiffs' payment of supracompetitive fees does not constitute antitrust injury. These assertions have no legal basis.

## I.   Consumers Have Standing for Walker Process Claims Under Applicable Ninth Circuit Law

As consumers, Plaintiffs are presumed to have antitrust standing. The Sherman Act was enacted "to assure customers the benefits of price competition." *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983). *See also Am. Ad Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999) ("the antitrust laws are

only intended to preserve competition *for the benefit of consumers*") (emphasis added).

"Consumers in the market where trade is . . . restrained *are presumptively the proper plaintiffs to allege antitrust injury*." *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (quoting *SAS v. Puerto Rico Tel. Co.*, 48 F.3d 39, 44-45 (1st Cir. 1995)) (emphasis added).

> Since the very purpose of antitrust law is to ensure that the benefits of competition flow to purchasers of goods affected by the violation, buyers have usually been preferred plaintiffs in private antitrust litigation, and a purchaser's standing to recover for an overcharge paid directly to an illegal cartel or monopoly is seldom doubted.

*In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 651 (E.D. Mich. 2000). Indeed, consumer injury (or potential injury) is a predicate for Sherman Act claims. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (antitrust laws enacted for "the protection of *competition*, not *competitors*"; no antitrust standing where competitor's injury did not harm competition); *Reudy v. Clear Channel Outdoors, Inc.*, No. 02-5438, 2007 U.S. Dist. LEXIS 26322, at *71 (N.D. Cal. Apr. 4, 2007) (antitrust plaintiffs must prove "that [their] loss comes from acts that reduce output or raise prices to consumers") (citations and punctuation omitted). "[R]eduction of competition does not invoke the Sherman Act until it harms consumer welfare." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).

### A.   Plaintiffs Have Antitrust Standing

Plaintiffs derive their standing directly from the Ninth Circuit's antitrust standing analysis. *Unitherm Food Sys., Inc v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1362 (Fed. Cir. 2004) (in *Walker Process* standing inquiry, once Federal Circuit has "determined that a patentee deserves no antitrust immunity, our inquiry shifts to apply the substantive antitrust laws"); *See also Molecular Diagnostics Labs. v. Hoffmann-La Roche, Inc.*, 402 F. Supp. 2d 276, 280-81 (D.D.C. 2005) ("there is little reason to think that standing requirements for *Walker Process* claims differ from standing requirements in more conventional antitrust actions").

Plaintiffs have standing under the generally applicable antitrust standing analysis in the Ninth Circuit. *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987-92 (9th

Cir. 2000); *Am. Ad*, 190 F.3d at 1054-61; *Amarel v. Connell*, 102 F.3d 1494, 1507-13 (9th Cir. 1996). Plaintiffs must demonstrate five factors to prove antitrust standing: "1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; 2) the directness of the injury; 3) the speculative measure of the harm; 4) the risk of duplicative recovery; and 5) the complexity in apportioning damages." *Id.* at 1507 (citing *Associated General*, 459 U.S. 519 at 535). *See also Knevelbaard*, 232 F.3d at 987; *Am. Ad*, 190 F.3d at 1054. Although Plaintiffs need not prevail on each factor to have standing, Plaintiffs here do prevail on each factor. *Id.* at 1055; *Amarel*, 102 F.3d at 1057.

### 1.    Plaintiffs Allege Antitrust Injury

The first component of antitrust standing is antitrust injury. *Knevelbaard*, 232 F.3d at 987-88; *Am. Ad*, 190 F.3d at 1055; *Amarel*, 102 F.3d at 1508. Although it is not dispositive, antitrust injury carries "great weight" in determining antitrust standing. The Ninth Circuit employs a five-factor test to determine antitrust injury: "1) unlawful conduct, 2) causing an injury to the plaintiff, 3) that flows from that which makes the conduct unlawful, and 4) that is of the type the antitrust laws were intended to prevent" and 5) that the plaintiff "be a participant in the same market as the alleged malefactors." *Glen Holly*, 352 F.3d at 372 (quoting *Am. Ad*, 190 F.3d at 1055, 1057).

Plaintiffs allege they have paid supracompetitive prices because Netflix used its patents to deter and exclude competition. (Compl. ¶¶ 3, 65, 66, 89). As to the first factor, deterring competition with fraudulently obtained patents is unlawful. *Cf. Walker Process Equip., Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 174 (1965). As to the second, third, and fourth factors, Plaintiffs allege injury (paying supracompetitive prices) that "flows from" Netflix's use of its sham patents, which use restrained competition and increased prices. There cannot be any clearer allegation of antitrust injury. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 340-42 (1979) recognized that consumers have antitrust standing under the Sherman Act. *See also Blue Shield of Va. v. McCready*, 457 U.S. 465, 480 (1982) ("consumer of psychotherapy services" had standing to sue because she was "within that area of the economy . . . endangered by [that] breakdown of competitive conditions"); *In re Cardizem CD*

*Antitrust Litig.*, 332 F.3d 896, 910 (6th Cir. 2003) (delay of cheaper generic drug due to collusive patent settlement was the "kind of injury [that] was undoubtedly a *raison d'etre* of the Sherman Act"). As to the fifth factor, Plaintiffs are "the ***presumptively proper plaintiff***[*s*]" as consumers in the Market. *Glen Holly*, 352 F.3d at 372 (emphasis added).

### 2. Plaintiffs Allege the Other Elements of Antitrust Standing

Plaintiffs also satisfy the other antitrust standing factors. Plaintiffs allege that Netflix incorporated a monopolistic overcharge into the prices they paid Netflix, because Netflix used its patents to deter competition. Netflix indicated that Blockbuster's competition caused it to reduce its prices:

> [C]ompetition has intensified significantly since Blockbuster officially launched its online service in August 2004. . . . [E]ffective November 2004, *in response to the changing competitive landscape, we lowered the price of our standard service to $17.99.*

(Compl. ¶ 66) (emphasis in complaint). Netflix's consumers – and no one else –  have standing to recover the overcharges alleged above that resulted from the delay in Blockbuster's entry into the market. Consumers' antitrust damages are the difference between prices they paid and the prices they would have paid in a competitive market, while competitors' damages are for lost profits. *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 374 (3d Cir. 2005).[1]

Netflix's competitors do not have standing to recover the overcharges Plaintiffs allege. *Andrx Pharmaceuticals, Inc. v. Biovail Corp. International*, 256 F.3d 799 (D.C. Cir. 2001) clearly articulated the distinctions in standing associated with these different types of damages:

> [A competitor's] injuries are neither derived from nor measured by injuries consumers may have suffered. Any injury to consumers would result from paying a supracompetitive price . . . [A competitor's] injury, on the other hand, is the result of foregone profits, i.e., the difference between the competitive market price it would have charged had it been in the market and its total costs.

---

[1] *See also In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 344 (D. Mass. 2003) (measure of damages in purchasers' antitrust claim against drug manufacturer arising from invalid patent lawsuits was monopolistic overcharge); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 309-11 (E.D. Mich. 2001) (measure of damages in purchasers' antitrust claim arising from drug manufacturers' manipulation of Hatch-Waxman procedure was amount of overcharge).

*Id.* at 817. *See also Atl. Richfield Co. v. U.S. Petrol. Co.*, 495 U.S. 328, 336-37 (1990) (competitors cannot recover damages for "any conspiracy . . . to charge higher than competitive prices"); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999) (plaintiffs could recover monopoly profits from price-fixing on transactions for which they were consumers, but not on transactions for which they were competitors).

Plaintiffs' allegation that they paid supracompetitive prices as a direct result of Netflix's deterrence of competition in the Market alleges "direct injury." *See Am. Ad*, 190 F.3d at 1058 ("directness of injury" evaluates "chain of causation between [plaintiff's] injury and the alleged restraint"). The "directness of injury" concerns whether Plaintiffs' injury is merely derivative of "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Associated General*, 459 U.S. at 540-42; *Amarel*, 102 F.3d at 1513. As shown above, ***no one but Netflix's consumers have standing to recover the Netflix's monopolistic overcharges***. *Cf. Hanover Shoe*, 392 U.S. at 494 (rejecting passing-on defense because it would allow "those who violate the antitrust laws by price fixing or monopolizing [to] retain the fruits of their illegality because no one was available who would bring suit against them"). Where a plaintiff alleges direct antitrust injury, the inquiry as to the "speculative measure of harm" factor is limited to other potential causes for the plaintiff's injury. *Am. Ad*, 190 F.3d at 1059. Here, Netflix's own Form 10-K indicated that it decreased its price due to competition, and gave no other reason for the decrease. (Compl. ¶¶ 65-66.) The logical conclusion is that lack of competition was the *only* factor keeping Netflix's prices high. *See Am. Ad*, 190 F.3d at 1059 (antitrust injury was not speculative without any suggestion of other causes besides antitrust violation).

Further, the "indirectness of the alleged injury also implicates the strong interest[s] . . . [in] avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *Associated General*, 459 U.S. at 543-43. Plaintiffs rent directly from Netflix without any intermediary. There is no possibility of apportioned damages or multiple liability. *Cf. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730-31, 737-38 (1977); *Knevelbaard*, 232 F.3d at 991-92 (without "multiple classes or layers of claimants

seek[ing] compensation," concerns about duplicative recovery or apportioning damages are "totally absent").

Moreover, the Injunctive Class alleged by Plaintiffs faces still looser standing requirements than the Damages Subclass. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110-11 (1986).

## B.   Defendants Advance No Reason to Rebut Presumption of Consumer Antitrust Standing

Netflix asserts the Court should deviate from the Ninth Circuit's antitrust standing analysis because consumers are supposedly "very remotely connected to any alleged patent fraud on the part of the defendant" and too remote to sue. (Def.'s Mot. 16.) This argument is unsustainable.

### 1.   The Supreme Court Rejected Essentially the Same "Remoteness" Argument Advanced By Netflix

Netflix asserts that Plaintiffs do not have standing because they are "remotely" connected to its patent fraud, "are not potential infringers of the defendant's patents, nor are they parties at whom *Walker Process*-type fraud is directed." (*Id*. 16.) Netflix's argument is essentially the same argument rejected by the Supreme Court in *Blue Shield* – that, because "the goal of the conspirators was to halt encroachment" by competitors, the plaintiff's injury was too "remote" for the plaintiff to sue. *Blue Shield*, 457 U.S. at 478. But antitrust standing "is not a question of [defendants'] specific intent." *Id*. at 479.

> [T]he [antitrust] remed[ies] cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market. . . . [where the] harm to [plaintiff] and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy.

*Id*. Similarly, here, Netflix argues that Plaintiffs do not have standing because they are not subject to patent infringement liability. Even if this were true, it would be irrelevant: Plaintiffs paid increased prices that were the intended result of Netflix deterring competition with its sham patents.

### 2.   Netflix's Consumer *Walker Process* Cases Are Inconsistent With the Antitrust Standing Analysis Applied in the Ninth Circuit

None of Netflix's cases provide any justification as to why a consumer's antitrust

standing is any different in a *Walker Process* suit than any other antitrust claim. As *Molecular Diagnostics* noted, Netflix's cited cases err by focusing on the enforcement of a sham patent – not on the substantive antitrust violation:

> The harm is not the invalid patent, but the use of the invalid patent to establish a monopoly. [T]here is little reason to think that standing requirements for *Walker Process* claims differ from standing requirements in more conventional antitrust actions.

*Molecular Diagnostics*, 402 F. Supp. 2d at 280-81. Although this Court is bound to apply Ninth Circuit law to this case,[2] *Molecular Diagnostics*' result was entirely consistent with Federal Circuit case law. Once the Federal Circuit "determine[s] that a patentee deserves no antitrust immunity, [its] inquiry shifts to apply the substantive antitrust laws." *Unitherm Food*, 375 F.3d at 1362. *See also Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1350 (Fed. Cir. 2007) (allegations that defendant threatened litigation against plaintiff's customers, but not plaintiff itself, stated *Walker Process* claim; patent enforcement's impact on competition was the relevant consideration). The Ninth Circuit's antitrust standing analysis under *Associated General* binds this Court and presumes consumer antitrust standing. *See Glen Holly*, 352 F.3d at 372 (consumers are "presumptively the proper plaintiffs to allege antitrust injury"); *Agron, Inc. v. Lin*, No. 03-05872, 2004 U.S. Dist. LEXIS 26605, at *24-29 (C.D. Cal. Mar. 16, 2004) (plaintiff had standing for *Walker Process* claim against patentee which did not sue plaintiff, but threatened its customers and sued another distributor).

The cases on which Netflix relies do not justify deviating from the *Associated General*'s antitrust standing analysis. Two of Netflix's cited cases are unpublished (and one is merely a special masters' recommendation). The other cases pre-date *Molecular Diagnostics*[3]

---

[2] Where the Court's subject matter jurisdiction over this case arises under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1332 (diversity jurisdiction), the Federal Circuit does not have jurisdiction over any appeal from this case and does not control this case. *See* 28 U.S.C. § 1295 (2007) (Federal Circuit has exclusive jurisdiction over cases in which the jurisdiction "was based, in whole or in part, on" 28 U.S.C. § 1338). This is true even though Netflix asserts patent law defenses. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988).

[3] *Molecular Diagnostics* was decided on December 1, 2005. *Cf. In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 546-547 (E.D.N.Y. 2005) (decided on March 31, 2005); *In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522 (D.N.J. 2004); *Asahi Glass Co. v. Pentech Pharms., Inc.*, 289 F. Supp. 2d 986 (N.D. Ill. 2003); *Carrot Components Corp. v. Thomas & Betts Corp.*, No. 85-5133, 1986 U.S. Dist. LEXIS 29723 (D.N.J. Feb. 11,

and their application to *Molecular*'s reasoning is thus questionable. *Indium Corp. of Am. v. Semi-Alloys Inc.*, 591 F. Supp. 608 (N.D.N.Y. 1984), *aff'd* 781 F.2d 879 (Fed. Cir. 1985) is the common touchstone in most of Netflix's cases.[4] *Indium*, however, sustained a plaintiff's standing under a traditional antitrust standing analysis of *Blue Shield* and *Associated General*. *Id*. at 613-15. *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704 (9th Cir. 2003), the only Ninth Circuit authority cited by Netflix, is entirely consistent with *Indium*. *Id*. at 711-12 (nascent competitor, unprepared to enter the market irrespective of the sham patent, did not have antitrust standing).

Netflix urges a *per se* rule that would require this Court to directly contradict *Molecular Diagnostics* and ignore the numerous court decisions which have upheld purchaser's claims against the anticompetitive use of patents. *See In re Cardizem*, 332 F.3d 896 (purchasers had antitrust standing to sue pioneer and generic drug manufacturers whose patent litigation settlement delayed competition); *Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006) (purchaser plaintiff claims arising from patent litigation, alleging manipulation of Hatch-Waxman process and delayed competition); *In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751, 755-57 (E.D. Pa. 2003) (indirect purchasers alleged causation where patentee's fraudulent litigation delayed FDA approval of competitors' drugs); *In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003) (class certification of consumers' *Walker Process* claims against drug manufacturer which used invalid patents to delay competition); *In re Buspirone Patent & Antitrust Litig.*, 185 F. Supp. 2d 363, 366-67, 373-75 (S.D.N.Y. 2002) (purchaser plaintiffs had *Walker Process* claims arising from defendants use of sham patent litigation to delay competition).

### C.   Sound Competition Policy Requires Consumer *Walker Process* Claims to Counterbalance Widespread Abuse of Potent Patent Rights

Consumer standing for *Walker Process* claims is an integral part of a sound policy on

_____

1986).

[4] *In re K-Dur Antitrust Litig.*, No. 01-1652, at 31 (D.N.J. Mar. 1, 2007); *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-2237, at 12 (S.D.N.Y. Nov. 2, 2006); *In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522, 529 (D.N.J. 2004); *Carrot Components*, 1986 U.S. Dist. LEXIS 29723, at *9-12.

competition and patent law. "It goes without saying that patents have adverse effects on competition. . . . 'By their nature, patents create an environment of exclusion, and consequently, cripple competition.'" *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 523 (E.D.N.Y. 2005) (quoting *Schering-Plough Corp. v. FTC*, 402 F.3d 1056, 1065-66 (11th Cir. 2005)). "[T]he rationale underlying [*Walker Process* was] achieving a suitable accommodation . . . between the differing policies of the patent and antitrust laws." *Walker Process*, 382 U.S. at 179 (Harlan, J., concurring). "The far-reaching social and economic consequences of a patent . . . give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud . . . and . . . are kept within their legitimate scope." *Id*. at 177. Likewise, the Federal Circuit has recognized that state law claims may curb the misuse of patents obtained through inequitable conduct (rather than fraud). *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470 (Fed. Cir. 1998) (state law tortious interference claim against patent infringement litigation threats based on patent obtained through inequitable conduct).

The balance between patent law and antitrust law is more critical than ever as the volume of patent applications has outstripped the Patent Office's ability to weed out applications for "bad patents"[5] which empower their holders to "suppress competition" and extract monopolistic overcharges.[6] Competitors' *Walker Process* lawsuits are not nearly enough to sustain this balance, because competitors are too easily intimidated by the possibility of injunctions and treble damages  (as shown by Blockbuster's settlement with Netflix). Without these liabilities. consumers are better able to enforce the antitrust laws vigorously. "If one believes that one of the primary purposes of a treble damages action is deterrence, then increasing the number of parties scrutinizing the actions of potential

---

[5] "The PTO's resources also appear inadequate to allow efficient and accurate screening of questionable patent applications. . . . Hearings participants estimated that patent examiners have from 8 to 25 hours to read and understand each application, search for prior art, evaluate patentability, communicate with the applicant, work out necessary revisions, and reach and write up conclusions. . . . Hearings participants unanimously held the view that the PTO does not receive sufficient funding for its responsibilities." Federal Trade Commission, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy* 9-10 (2003), *available at* http://www.ftc.gov/os/2003/10/innovationrpt.pdf.
[6] *Id*. at 5-6.

monopolists will further that goal." *Molecular Diagnostics*, 402 F. Supp. 2d at 281.

## II.    Plaintiffs Properly Allege A *Walker Process* Claim

Netflix argues that Plaintiffs do not state a *Walker Process* claim because: 1) *Walker Process* claims must allege patent enforcement beyond that necessary to sustain jurisdiction for a declaratory judgment; 2) Plaintiffs do not allege this activity; and 3) Plaintiff's patent enforcement allegations are not sufficient under Rule 9(b). Each of these claims is contrary to the law, and none can be sustained. Despite its "settlement" with Blockbuster, Netflix cannot deny that Blockbuster has asserted, as a matter of public record, a claim for lost profits that logically corresponds to a delayed entry in the Market. (Blockbuster's Countercl. ¶¶ 108, 117.) By alleging that they paid monopolistic overcharges because Netflix used fraudulently obtained patents to deter competition, Plaintiffs stated a valid *Walker Process* claim.

Netflix's faulty arguments above fail to address two of Plaintiffs' claims. First, Plaintiffs allege that Netflix's patent litigation continues to deter competitors *besides Blockbuster* and causes the Plaintiffs ongoing damages. (Compl. ¶¶ 47, 89.) Netflix argues that "Plaintiffs plainly cannot rely" on these allegations because "Blockbuster continues to offer an online DVD rental service notwithstanding the lawsuit." (Def.'s Mot. 10.) Netflix's fraudulently-obtained patents are an artificial barrier to entry to the Market. *See Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997). Although Blockbuster's entry into the market led Netflix to lower its prices, that does not mean that Netflix's prices are as low as they would be if the threat of patent liability were removed and Netflix's other competitors were free to compete.[7] As the patents continue to deter other potential competitors that could *further* reduce prices in the Market, Plaintiffs pay supracompetitive fees and accrue ongoing damages.[8] "[I]t is economically reasonable to conclude that [whenever a monopoly

---

[7] The Complaint alleged that the "competitive price for a standard package cannot exceed (but *is by no means as high as*) $18 per month." (Compl. ¶¶ 9, 69) (emphasis added). Although Blockbuster competes, it does not have the market power to force Netflix to price competitively and so Plaintiffs continue to pay supracompetitive prices. This claim bears some analytic similarities to "umbrella damages," which occur when a partial price-fixing conspiracy succeeds in raising the prices of non-colluding competitors. *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1338-41 (9th Cir. 1982).

[8] Despite Netflix's protestations, the Complaint adequately alleges these ongoing damages

1   restrains competition, it] has the effect of raising or maintaining prices for all purchasers in

2   the market above what they would have been otherwise." *Bradburn Parent/Teacher Store v.*

3   *3M*, No. 02-7676, 2004 U.S. Dist. LEXIS 16193, at *45 (E.D. Pa. Aug. 17, 2004). *See also*

4   *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 724 (D.C. Cir. 2001) ("In a duopoly, a market with only

5   two competitors, supracompetitive pricing at monopolistic levels is a danger"). As Netflix

6   retains significant monopoly power (reflected by an 81% share of a market with high barriers

7   to entry),[9] it is just as liable as any other monopolist that exercises monopoly power without a

8   100% market share.[10]

9        Second, Netflix fails altogether to account for the claims of the Injunctive Class

10  alleged in the Complaint. Plaintiffs alleged that they will suffer harm if competition is

11  excluded from the Market. (Compl. ¶¶ 89, 97-98, 103-04, 107.) The Injunctive Class alleges

12  claims under Section 16 of the Clayton Act, which "authorizes injunctive relief upon the

13  demonstration of 'threatened' injury[,] even though the plaintiff has not yet suffered actual

14  injury." *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 132 (1969). *See also Lucas*

15  *Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998) ("an

16  antitrust plaintiff seeking injunctive relief need only show a threatened injury, not an actual

17  one"); *Doe v. Abbott Labs.*, No. 04-1511, 2004 U.S. Dist. LEXIS 29129 (N.D. Cal. Oct. 21,

18  2004) (allowing antitrust claimants without standing for antitrust damages to proceed on claim

19  _____

20  caused by Netflix's patent litigation. Netflix argues that the allegations in the Complaint that
    the patent litigation continues to deter other competitors are "deficient" without "details about

21  how [the patent litigation]. . . did so or what effect this allegedly had on the market." (Def.'s
    Mot. 10, citing Compl. ¶ 47.) However, Plaintiffs do not need to plead causation with

22  particularity. *See also In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1022 (S.D.
    Cal. 2006) (on remand from *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), applying Rule

23  8(a)'s general pleading requirements applied to causation allegations).
    [9] Netflix and Blockbuster have 5.2 million and 1.2 million subscribers, respectively. (Compl.

24  ¶¶ 9, 69.)
    [10] The entry of new competitors does not foreclose the possibility that an antitrust defendant

25  has market power. *Rebel Oil*, 51 F.3d at 1440-41 (entry of new competitors did not foreclose
    possibility that a monopolist had market power). *See also United States v. Dentsply Int'l, Inc.*,

26  399 F.3d 181, 190-96 (3d Cir. 2005) (same); *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*,
    386 F.3d 485, 501 (2d Cir. 2004) (whether defendant's period of monopoly power was long

27  enough to create anticompetitive effects or was merely "transitory advantage inherent in being
    a first entrant" was an issue of fact). "[A] firm with a consistently high, albeit declining,

28  market share in a market with high barriers to entry may possess[] monopoly power." *Oahu
    Gas Serv., Inc. v. Pac. Resources, Inc.*, 838 F.2d 360, 367 (9th Cir. 1988) (firm whose market
    share declined from 100% to 68.2% over 11 years possessed market power).

for injunctive relief).

### A. Plaintiffs' Claims Hinge on the Deterrence and Restraint of Competition

*Molecular Diagnostics* demonstrates why the logic behind the standards for standing and damages for competitor-side *Walker Process* claims do not apply to Plaintiffs' consumer-side claims against Netflix's monopolistic overcharges. *Unless the Court employs a standard of liability that tracks the deterrence and/or restraint of competition, it will create a rule of law that gives some measure of shelter to the monopoly profits acquired from fraudulently-obtained patents. See Hanover Shoe*, 392 U.S. at 494 (refusing to allow defense that would immunize monopoly profits by eliminating potential purchaser plaintiffs).

Not even Netflix contests that the damages Plaintiffs allege stem from an entirely different source (monopolistic overcharge) than the damages a competitor alleges in a *Walker Process* claim (lost profits). This is "a critical distinction," *Molecular Diagnostics*, 402 F. Supp. 2d at 286, because it follows that the scope of liability on Plaintiffs' claims is entirely different than a competitor's claim. "[T]he enforcement of a patent [is not] the relevant injury. . . . [A consumer-plaintiff's] injury arose through the payment of supra-competitive prices resulting from an illegitimately obtained monopoly . . ." *Id*. at 285, 286. *See Hydril*, 474 F.3d at 1350 (plaintiff which alleged impact on competition, but not threats of patent litigation against itself, stated *Walker Process* claim). *Molecular Diagnostics* found that the monopoly created by a fraudulently-obtained patent was a continuing antitrust violation, and it rejected the defendants' argument that the statute of limitations had run since the patents had been found invalid in litigation.

> Having found that a direct purchaser has standing to assert a *Walker Process* claim, consistency requires a finding that the continuing violation theory entitles [a consumer-plaintiff] to pursue all claims accruing four years prior to the filing of its complaint. [E]ach time [a consumer-plaintiff] was allegedly forced to pay a supra-competitive price as a result of [defendants'] anticompetitive conduct, a separate injury accrued.

*Molecular Diagnostics*, 402 F. Supp. 2d at 286. Here, Plaintiffs' injury accrued when they were required to pay monopolistic overcharges. *Molecular Diagnostic*'s rationale and result compliment the reasoning in *Indium*, which dealt with a competitor's *Walker Process* claim:

> [I]t would be a mistake to interpret "enforcement" [of fraudulently-obtained patents] too narrowly. . . The concept must be broad enough to afford a remedy not only to those who actually produced an infringing article and were forced to stop by infringement suit or the threat thereof, but also to those who were ready, willing, and able to produce the article and would have done so but for the exercise of exclusionary power by the defendant.

*Indium*, 591 F. Supp. at 614. The limit for liability on Plaintiffs' claims is not Netflix's patent enforcement activities, but whether Netflix's patents deterred competition, i.e., proximately caused potential competitors not to enter or to delay competing in the Market. On the one hand, Plaintiffs must show that there were competitors "ready, able, and willing" to enter the Market. *Id*. On the other hand, Plaintiffs must also show that Netflix's patents at least partially caused competitors to be deterred from entering the Market.

The "patent enforcement" standard urged by Netflix does not even accurately reflect the law applicable to competitor-side *Walker Process* claims. Netflix's assertion that "the level of enforcement activity necessary to sustain a *Walker Process* claim is higher than that required for a declaratory judgment action" misrepresents *Unitherm Food*. (Def.'s Mot. 7.) *Unitherm Food* held that "the standards that we have developed for determining jurisdiction in a Declaratory Judgment Action of patent invalidity ***also define the minimum level of 'enforcement' necessary to expose the patentee to a* Walker Process *claim for attempted monopolization.***" *Unitherm Food*, 375 F.3d at 1358 (emphasis added). *See also Hunter Douglas, Inc. v. Harmonic Design*, 153 F.3d 1318, 1322 (Fed. Cir. 1998) (state law claim arising from patentee merely "*inform*[*ing*] . . . purchasers of motorized window shades that [licensees had] exclusive license to sell motorized window shades . . . covered by the . . . patents"). Even the Federal Circuit's standard for competitor *Walker Process* cases does not require the "threats," "accusing letters," "telephone calls," "offers of a license," or "other communications" which Netflix argues are required. (Def.'s Mot. 10.) "[E]nforcement actions are not a *sine qua non* of monopolizing by patent fraud." *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265, 266 (7th Cir. 1984); *Rohm & Haas Co. v. Dawson Chemical Co.*, 635 F. Supp. 1211, 1218 (S.D. Tex. 1986). *Unitherm Food* recognized that fraud on the Patent Office could violate the antitrust laws in innumerable ways:

> *Walker Process* claims . . . relate to a single type of behavior capable of

1    stripping a patentee's patent-law immunity and thereby exposing the patentee to
     liability under [antitrust] laws. . . . [W]e cannot enumerate the full range of
2    activities capable of effecting such a loss of immunity . . .

3  *Unitherm Food*, 375 F.3d at 1357. *See Goss Int'l Ams., Inc. v. MAN Roland, Inc.*, 2006 DNH

4  62, 2006 U.S. Dist. LEXIS 36386, at *10 (D.N.H. June 2, 2006) (enforcement element of

5  *Walker Process* claim "may . . . be met by action short of filing suit, for example sending

6  warning letters to alleged infringers"). The Federal Circuit has recognized that a *Walker*

7  *Process* plaintiff may state a claim when the defendant's enforcement of a sham patent against

8  the plaintiff's customers (and not the plaintiff itself) restrains competition.[11]

9         In any event, Netflix dramatically understates the sea change in the standard for

10 declaratory actions recently announced in *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764

11 (2007). In *MedImmune*, the Supreme Court found that the Declaratory Judgment Act

12    do[es] not require a plaintiff to expose himself to liability before bringing suit
      to challenge the basis for the threat . . . The plaintiff's own action (or inaction)
13    in failing to violate the law eliminates the imminent threat of prosecution, but
      nonetheless does not eliminate Article III jurisdiction.
14

15 *Id*. at 772. *Cf. Societe de Conditionnement en Aluminum v. Hunter Eng'g Co.*, 655 F.2d 938,

16 943 (9th Cir. 1981) (declaratory judgment prevents patentee from "chill[ing] competition by

17 declaring that his competitors were infringing his patents and by threatening an infringement

18 suit"). After *MedImmune*, the Federal Circuit substantially expanded its standard for

19 jurisdiction in declaratory judgment cases:

20    Article III jurisdiction may be met where the patentee takes a position that puts
      the declaratory judgment plaintiff in the position of either pursuing arguably
21    illegal behavior or abandoning that which he claims a right to do. . . . [W]here a
      patentee asserts rights under a patent based on certain identified ongoing or
22    planned activity of another party, and where that party contends that it has the
      right to engage in the accused activity without license, an Article III case or
23    controversy will arise and the party need not risk a suit for infringement by
      engaging in the identified activity before seeking a declaration of its legal
24    rights.

25 *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007). *SanDisk*

26 ───────────────
   [11] "Threats of patent litigation against customers, based on a fraudulently-procured patent,
27 with a reasonable likelihood that such threats will cause the customers to cease dealing with
   their supplier, is the kind of economic coercion that the antitrust laws are intended to prevent.
28 A supplier may be equally injured if it loses its share of the market because its customers stop
   dealing with it than if its competitor directs its monopolistic endeavors against the supplier
   itself. Without customers, a supplier has no business." *Hydril*, 474 F.3d at 1350.

abrogated the cases using the "'reasonable apprehension' standard" which Netflix cites.[12] All that the new *SanDisk* standard requires of Plaintiffs is to allege that Netflix put its competitors "in the position of either pursuing arguably illegal behavior or abandoning" the Market in which Plaintiffs claim they have a right to compete.[13]

**B.    Plaintiffs Alleged That the Netflix Patents Deterred Competitors**

Netflix's assertions that the Complaint merely alleges that Netflix's competitors only learned of Netflix's patents, and did not allege any of Netflix's competitors were "deterred from offering an online DVD rental service as a result of any 'overt enforcement actions' by Netflix," contradicts the Complaint. (Def.'s Mot. 9.) The Complaint alleges:

> Netflix monopolized the online DVD rental market by ***deterring other competitors from entering that market***. But for the threat of liability for infringing on the '450 and '381 Patents, there would be more competition (and, hence better services and lower prices) in the online DVD rental market. The '450 and '381 Patents ***have deterred and continue to deter competitors*** and delay the introduction of competition in the market for online DVD rentals and related subscription services. . . .

(Compl. ¶ 3) (emphasis added) The Complaint also alleges that

1.    "Blockbuster delayed its entry into the relevant market because of the '450 Patent, at least for as long as it took Blockbuster to 'figure[] out' that the '450 Patent was 'a joke'" and "delayed entering into the Relevant Market after learning of the '450 Patent until August 2004,"

2.    Wal-Mart "withdrew from the Relevant Market after Netflix alerted Wal-Mart to the '450 Patent . . . in order to induce Wal-Mart to withdraw from the Relevant Market,"

3.    Amazon.com "learned of Netflix's '450 Patent, either by its own efforts or by Netflix's effort" and "discarded its plans to enter the Relevant Market in the United States in August 2004 because of the '450 Patent"

4.    The *Netflix, Inc. v. Blockbuster, Inc.*, No. 06-2361 litigation "has had both the effect of impairing Blockbuster Online's competitive impact and of deterring other competitors from entering the relevant market . . ."

---

[12] *Cf. Merch. Techs., Inc. v. Telefonix, Inc.*, No. 05-1195, 2007 U.S. Dist. LEXIS 9266 (D. Or. Feb. 7, 2007); *Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. 05-3465. 2006 U.S. Dist. LEXIS 2176 (N.D. Cal. Jan. 3, 2006); *K-Lath, Inc. v. Davis Wire Corp.*, 15 F. Supp. 2d 952 (C.D. Cal. 1998)). (Def.'s Mot 7-8.) Netflix' use of *California Eastern Laboratories, Inc. v. Gould*, 896 F.2d 400 (9th Cir. 1990) is also misleading, as it has no relevance to a consumer's *Walker Process* claims. (*Cf.* Def.'s Mot. 6-7 *with Cal. E. Labs*, 896 F.2d at 403 ("This case . . . began as a declaratory judgment action to *determine actual ownership of the patent*") (emphasis added).)
[13] Although the Federal Circuit's jurisprudence does not bind this Court, Plaintiffs have not found any published Ninth Circuit case on point.

(*Id*. ¶¶ 47, 58-59, 60, 63.) In the context of Netflix's Motion to Dismiss, all the Complaint's "allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to" Plaintiffs. *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1046 (9th Cir. 2006). The Complaint requires only "enough factual matter (taken as true) to suggest that," or "to raise a reasonable expectation that discovery will reveal evidence" that, Netflix deterred its competitors with its patents. *Bell Atlantic Corp. v. Twombly*, No. 05-1126, 2007 U.S. LEXIS 5901, at *23 (May 21, 2007) (discussing Rule 8(a)'s application to agreements in violation of 15 U.S.C. § 1). It is reasonable to infer from these allegations that Wal-Mart and Amazon.com had a reasonable apprehension of patent litigation, let alone that Netflix put Wal-Mart and Amazon.com in the position of either arguably violating Netflix's patents or abandoning the Market. Netflix asserts that Plaintiffs' allegation that Blockbuster delayed its entry into the Market "lacks all credibility" because Blockbuster's counterclaim alleged that "Netflix never attempted to assert its patents against Blockbuster prior to filing an infringement action on April 4, 2006." (Def.'s Mot. 9.) Netflix's implicit assumption that it must have actually threatened Blockbuster with patent infringement litigation before it deterred competition is contrary to *MedImmune* and *SanDisk.*

## C.   To the Extent Rule 9(b) Applies, Plaintiffs' Allegations That Netflix Deterred Competition Suffice

Netflix claims that Plaintiffs' allegations that Netflix deterred competition do not comply with Rule 9(b). (Def.'s Mot. 11-13.)

As Plaintiffs' allegations of Netflix's fraud on the Patent Office mirror the allegations in Blockbuster's counterclaim which this Court upheld, Netflix cannot challenge those allegations. *Netflix*, 2006 U.S. Dist. LEXIS 63154, at *9-10. The Court did not apply Rule 9(b) to the portions of Blockbuster's *Walker Process* claim that did not allege fraud. *Id*. at *18 (where Blockbuster adequately alleged fraud on the Patent Office, there was "no contest that . . . Blockbuster has also sufficiently alleged the components of an underlying antitrust violation under Section 2 of the Sherman Act"). *See also EMC Corp. v. Storage Tech. Corp.*, 921 F. Supp. 1261, 1263 (D. Del. 1996) (allegation of inequitable conduct satisfies Rule 9(b)

by identifying prior art and specific misconduct).

### 1. Rule 9(b) Does Not Apply to Plaintiffs' Allegations That Netflix Deterred Competition

Allegations beyond those circumstances constituting fraud do not need to comply with Rule 9(b). Plaintiffs' allegations of patent enforcement (except the sham litigation against Blockbuster) did not and did not need to allege fraud – they are not subject to Rule 9(b). (Compl. ¶¶ 3, 47, 58-59, 60, 63, 94.) As Plaintiffs "allege some fraudulent and some non-fraudulent conduct[,] . . . only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003).

> The text of Rule 9(b) requires only that in "*all averments of fraud* . . ., the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b) [emphasis in *Vess*]. The rule does not require that allegations supporting a claim be stated with particularity when those allegations describe non-fraudulent conduct. . . . To require that non-fraud allegations be stated with particularity merely because they appear in a complaint alongside fraud averments, however, serves no similar reputation-preserving function, and would impose a burden on plaintiffs not contemplated by the notice pleading requirements of Rule 8(a).

*Id*. "Rule 9(b) . . . only requires the identification of the circumstances constituting fraud . . . [A] statement[] of the time, place and nature of the alleged fraudulent activities will [suffice]." *Bosse v. Crowell Collier & MacMillan*, 565 F.2d 602, 611 (9th Cir. 1977). *See also In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926-927 (9th Cir. 1993) (details of fraudulently omitted loans did not need to be alleged); *Meram v. MacDonald*, No. 06-1071, 2006 U.S. Dist. LEXIS 79069, at *13 (S.D. Cal. Oct. 23, 2006) ("particularity pleading requirement does not apply to reasonable reliance or other elements" of fraud); *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257, 1264 (N.D. Cal. 2006) (Rule 9(b) applies to the specifics of alleged misrepresentations, but Rule 8 applies to other aspects of the plaintiff's complaint).

### 2. Rule 9(b) Does Not Bar Claims Where the Information Needed to Be Alleged With Specificity Is Not Available to the Plaintiffs

Even if Rule 9(b) applied, it would not bar Plaintiffs' claims. Although Netflix disingenuously characterizes Plaintiffs' pre-filing investigation as "less-than-thorough," it does not give any hint of what else Plaintiffs should have or could have done. (Def.'s Mot. 12.) As the Complaint states, Plaintiffs' counsel approached each of the potential competitors

regarding Netflix's patents and was rebuffed by each one. The Complaint complies with Rule 9(b) because Plaintiffs have exhausted all possible avenues of obtaining this information – short of discovery or industrial espionage – but this same information is accessible to Netflix.

> [Rule 9(b)] may be relaxed as to matters within the opposing party's knowledge. For example, in cases of corporate fraud, plaintiffs will not have personal knowledge of all of the underlying facts. In such cases, the particularity requirement may be satisfied if the allegations are accompanied by a statement of the facts on which the belief is founded.

*Moore v. Kayport Package Express*, 885 F.2d 531, 540 (9th Cir. 1989). To the extent the Court finds that Plaintiffs allege "fraud against a third party, less detail may be required under Rule 9(b) because [Plaintiffs do] not have access to all the facts necessary to detail [their] claim." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992). *See Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998) ("Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim, and that is most likely to be the case where . . . the plaintiff alleges a fraud against one or more third parties"). Courts have not hesitated to apply this reasoning in the appropriate situations.[14] This reasoning applies with special force in an antitrust claim, where "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly" because "the proof is largely in the [defendants'] hands . . ." *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976). *See also Toscano v. PGA*, 258 F.3d 978, 982-983 (9th Cir. 2001); *Am. Ad*, 92 F.3d at 788.

As Netflix notes, the Complaint alleges that the Netflix patent deterred its competitors on information and belief. (Def.'s Mot. 12.) The Complaint bases this allegation on: 1) the fact that "Blockbuster delayed its entry into the [Market for] at least for as long as it took Blockbuster to 'figure[] out' that the '450 Patent was 'a joke,'" as Netflix's CEO said; 2) Wal-Mart left the Market because Wal-Mart "is not the shrinking violet of our national economy [and] it is very unlikely that Wal-Mart voluntarily quit the field and ceded its share of the [Market] to Netflix"; and 3) Netflix's CEO "announced that Amazon planned to enter the

---

[14] *See, e.g.*, *Wood v. Apodaca*, 375 F. Supp. 2d 942, 949 (N.D. Cal. 2005); *Arenson v. Whitehall Convalescent & Nursing Home*, 880 F. Supp. 1202, 1208 (N.D. Ill. 1995); *Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 749 F. Supp. 1042, 1046-48 (D. Or. 1990).

[Market] in October 2004 [which announcement caused] the loss of 41 percent of Netflix's stock valuation" and Amazon introduced a DVD rental service outside the United States. (Compl ¶¶ 58, 61, 62.) Although Plaintiffs do not yet have access to communications between Netflix and its competitors, these facts strongly indicate that Netflix's patents delayed and/or deterred Blockbuster, Wal-Mart, and Amazon.com from entering the Market. "Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud" besides the standard "date, place or time" allegations. *In re Wellbutrin SR Antitrust Litig.*, No. 04-5525, 2006 U.S. Dist. LEXIS 9687, at *36 (E.D. Pa. Mar. 9, 2006) (consumer-side *Walker Process* claims, quoting *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)).

### III.    Plaintiffs State Unfair Competition and Cartwright Act Claims

Netflix challenges Plaintiffs' California law claims under the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726), and the unfair competition law (Cal. Bus. & Prof. Code § 17200) ("UCL") on a variety of grounds. Plaintiffs' state law claims are significant because they may provide Plaintiffs separate and additional remedies.

Plaintiffs have standing under the Cartwright Act and the Unfair Competition Law, even if the Court decides that they do not have standing under the Sherman Act. The Cartwright Act "is broader in range and deeper in reach than the Sherman Act . . ." *Cianci v. Superior Court*, 40 Cal. 3d 903, 920, 710 P.2d 375, 384 (1985). *See Cellular Plus v. Superior Court*, 14 Cal. App. 4th 1224, 1234-35, 1240-43, 18 Cal. Rptr. 2d 308, 313-14, 317-19 (Cal. Ct. App. 1993) (standing under Cartwright Act applies to plaintiffs with direct or indirect antitrust injury, and Sherman Act's filed-rate defense does not apply to Cartwright Act claim); *Knevelbaard*, 232 F.3d at 991 (citing *Cellular Plus*, holding that standing for Cartwright Act claim is broader than Sherman Act claim). Likewise, the UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 973 P.2d 527, 540 (1999).

Similarly, Plaintiffs would recover under their California-law claims if the jury finds

they proved, *inter alia*, that Netflix's conduct before the Patent Office was inequitable and in bad faith, but their evidence fell short of actual fraud. *Walker Process* claims require proof of actual fraud, rather than mere inequitable conduct. *Nobelpharma Ab v. Implant Innovations*, 141 F.3d 1059, 1068-71 (Fed. Cir. 1998). Inequitable conduct is easier to prove than the fraud needed to sustain a *Walker Process* claim. *Id*. at 1070-71. Patentees can be liable on state law claims based on the enforcement of patents obtained through inequitable conduct. *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1350-51, 1355 (Fed. Cir. 1999) (plaintiff stated Lanham Act and state law unfair competition claims against patentee who claimed that plaintiff could not produce a competing product that did not infringe on patent); *Dow*, 139 F.3d 1470 (Fed. Cir. 1998) (state law tortious interference claim against patent infringement litigation threats based on patent obtained through inequitable conduct).

### A. Patent Law Does Not Preempt Plaintiffs' California Law Claims

Netflix claims that patent law, "which occupies the field of PTO- related conduct," preempts Plaintiffs' state law claims. (Def.'s Mot. 18.) The Federal Circuit case law on point directly contradicts this claim.[15] *See Hunter Douglas*, 153 F.3d at 1331-37 (patent law did not preempt state law unfair competition claims arising from false claims regarding invalid, unenforceable patent). Where a plaintiff's claims arise from the procurement or publication of a patent, the plaintiff "would need to allege and prove ultimately" either "fraudulent conduct before the PTO or bad faith in the publication of a patent . . . to stave off preemption by federal patent law." *Id*. at 1336-37.[16] Further, a state law claim based on the bad faith enforcement of an patent is not preempted if it involves "elements different to those required for inequitable conduct before the PTO." *Dow*, 139 F.3d at 1477. *Dow* found that the patent laws did not preempt tortious interference claims arising from a patentee's claims that the plaintiff's commercial partners infringed on an allegedly invalid patent. *Id*. (claim was "not premised upon bad faith misconduct in the PTO, but rather is premised upon bad faith

---

[15] Plaintiffs continue to argue Federal Circuit law as they have not found applicable Ninth Circuit cases.
[16] "Exactly what constitutes bad faith remains to be determined on a case by case basis." *Zenith Elecs.*, 182 F.3d at 1354.

misconduct in the marketplace").[17]

Netflix cites *Semiconductor Energy Laboratory Co. v. Samsung Electronics Co.*, 204 F.3d 1368 (Fed. Cir. 2000) to argue that the patent laws preempt state law claims "based on activities constituting inequitable conduct or fraud before the Patent and Trademark Office." (Def.'s Mot. 18.) In *Samsung*, the Court distinguished *Dow* because the state law claim in *Dow* "included elements not found in the patent infringement defense of inequitable conduct," but the *Samsung* plaintiff's claims did "not contain as necessary elements of the offense the sorts of acts beyond misrepresentations or willful omissions to the PTO . . ." *Samsung*, 204 F.3d at 1382.

*Samsung* does not apply to Plaintiffs' claims. Plaintiffs' Cartwright claim requires some form of antitrust injury, which can only be met if Netflix deterred its competitors. While Plaintiffs could frame a UCL claim, for instance, on Netflix's breach of a patentee's duty of candor required under 37 C.F.R. § 1.56, such claim would not accrue until Plaintiffs showed they "lost money or property as a result of" this breach – that Netflix restrained competition. Cal. Bus. & Prof. Code § 17204 (2007). Both Plaintiffs' Cartwright Act and UCL claims do not accrue unless Netflix's conduct deprived Plaintiffs of access to a competitive Market. *Cf. Dow*, 139 F.3d at 1478 (sustaining claims "based essentially on bad faith communications that interfere with contractual relations"). Plaintiffs' claims are well clear of preemption under the patent laws.[18]

### B. California's Litigation Privilege Does Not Apply to Communications Alleged in the Complaint

Netflix asserts that California's litigation privilege, codified in California Civil Code § 47(b), protects any "threats of patent infringement litigation" that deterred competition in the Market. (Def.'s Mot. 21.) This argument is contrary to the law.

---

[17] Many courts have recognized that the patent laws do not preempt state law unfair competition claims arising from sham patents' anticompetitive impact, and that such claims do not even give rise to federal jurisdiction. *See In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-1628, 2005 U.S. Dist. LEXIS 6825 (S.D.N.Y. Apr. 20, 2005) (collecting cases, remanding state law claims).

[18] Inasmuch as Netflix's other lower court decisions support preemption of Plaintiffs' claims, they further expose their own infirmities by contradicting *Hunter*, *Dow*, and *Zenith*. (Def.'s Mot. 19-20.)

### 1.    The Litigation Privilege Does Not Apply to Third Parties Like Plaintiffs

At the outset, the litigation privilege does not apply because Plaintiffs were not parties to any such patent enforcement. California's litigation privilege extends to claims "only when the claim is founded on the [defendant's] misconduct in earlier litigation against the plaintiff, at least if the privilege would also apply to bar a derivative tort action based on the same conduct." *Kashian v. Harriman*, 98 Cal. App. 4th 892, 924, 120 Cal. Rptr. 2d 576, 601 (Cal. Ct. App. 2002) (following *Rubin v. Green*, 4 Cal. 4th 1187, 1202-04, 847 P.2d 1044, 1053-54 (1993). "[M]embers of the public who, unlike plaintiff, are not adversaries in *[the] collateral litigation . . . have standing to pursue unfair competition claims under the statute.*" *Id.* (quoting *Rubin*, 4 Cal. 4th at 1204, 847 P.2d at 1054) (emphasis in original). While this result has been called "anomalous," *id.*, it is wholly consistent with the litigation privilege's well-established, underlying rationale: eliminating "subsequent[] derivative tort actions," "enhancing the finality of judgments and avoiding an unending roundelay of litigation . . ." *Flatley v. Mauro*, 39 Cal. 4th 299, 321-322, 46 Cal. Rptr. 3d 606, 623 (2006) (quoting *Silberg v. Anderson*, 50 Cal. 3d 205, 213, 786 P.2d 365, 365 (1990)). *Kashian* is not an isolated decision. *See Am. Prods. Co., Inc. v. Law Offices of Geller, Stewart & Foley, LLP*, 134 Cal. App. 4th 1332, 1346, 37 Cal. Rptr. 3d 93, 102 (Cal. Ct. App. 2005) (following *Kashian* to same result). Plaintiffs' claims do not contribute to "an unending roundelay of litigation" between the parties to Netflix's patent enforcement activity. Because Plaintiffs were never a party to such activity, the litigation privilege cannot apply to their claims.

### 2.    The Litigation Privilege Does Not Apply Unless Netflix Can Prove Its Litigation Threats Were Sent in Connection With Seriously, Sincerely Contemplated Litigation

Further, even if the litigation privilege could apply to Plaintiffs' claims, *contra Rubin*, Netflix does not and cannot establish that it does. It is reasonable to infer from Complaint's allegations, *Simpson*, 452 F.3d at 1046, that Netflix had no intention of suing on the '450 Patent alone because it was an extraordinarily weak patent, but was merely biding its time

until the (putatively stronger) '381 Patent issued.[19] The litigation privilege only applies where communications "have some connection or logical relation to the [litigation]." *Silberg*, 50 Cal. 3d at 212, 786 P.2d at 369 (fourth element of litigation privilege). With respect to pre-litigation threats, the litigation privilege only applies to "statement[s] made in connection with a proposed litigation that is contemplated in good faith and under serious consideration." *Blanchard v. DIRECTV, Inc.*, 123 Cal. App. 4th 903, 919, 20 Cal. Rptr. 3d 385, 396 (Cal. Ct. App. 2004). The litigation privilege does not prevail on a motion to dismiss if the parties' pleadings raise an issue of fact as to a defendant's sincerity regarding his intent to litigate. *See MGA Entm't, Inc. v. Mattel, Inc.*, No. CV 05-2727, 2005 U.S. Dist. LEXIS 18594, at *39 (C.D. Cal. Aug. 26, 2005) (motion to dismiss denied because threats to sue former employees for disclosing publicly available information raised issue of fact regarding litigation privilege's "good faith" requirement); *Gopp v. Legion Ins. Co.*, No. 01-539, 2001 U.S. Dist. LEXIS 14811, at *13 (N.D. Cal. Sept. 10, 2001) (Alsup, J.) (dismissal on litigation privilege grounds inappropriate); *Fuhrman v. Cal. Satellite Sys.*, 179 Cal. App. 3d 408, 421-2, 231 Cal. Rptr. 113, 118 (Cal. Ct. App. 1986), *rev'd on other grounds by Silberg*, 50 Cal. 3d at 219, 786 P.2d at 374 (allegation that defendants sent form letter threatening litigation to 8,700 residents cast serious doubt on defendants' good faith and raised a factual question whether the letters fell within privilege).

As Netflix has not carried the burden of demonstrating that it contemplated in good faith and seriously considered litigating on its first patent (before the second patent issued), the litigation privilege does not apply to any threat of such litigation. Netflix bears "the burden of establishing the preliminary facts on which they base [its] affirmative defense of the litigation privilege." *Edwards v. Centex Real Estate Corp.*, 53 Cal. App. 4th 15, 37, 61 Cal. Rptr. 2d 518, 532 (Cal. Ct. App. 1997). Remarkably, despite all its arguments, Netflix never denies the communications alleged in the Complaint, nor does it produce satisfactory

---

[19] The Complaint alleges that the '450 Patent issued on June 23, 2003, and that the '381 Patent issued on April 4, 2006. (Compl. ¶ 1.) The Complaint alleges that: 1) the '450 Patent disclosed no prior art; 2) that Netflix's CEO called the '450 Patent a "joke,"; and 3) that Netflix sued Blockbuster for patent infringement on the very same day that the '381 Patent issued. (*Id.* ¶¶ 19, 45, 46.)

explanations from the facts alleged that such communications were "made in connection with a proposed litigation that is contemplated in good faith and under serious consideration." Indeed, given Netflix's own evaluation of the '450 Patent as a "joke," there can be little doubt that any threat of litigation on the '450 Patent was not sincere – and so the litigation privilege cannot attach to any enforcement activity on that patent.[20]

**C.     Complaint Adequately Alleges Trust Sufficient to State Cartwright Act Claim**

Netflix claims that Plaintiffs' Cartwright Act claim fails because the Cartwright Act "requires a conspiracy between independent economic actors." (Def.'s Mot. 22.) Netflix's argument is belied by the allegations in the Complaint.

**1.     Ninth Circuit Jurisprudence Recognizes Antitrust Conspiracy Between Defendant and its Counsel**

Netflix claims Plaintiffs' allegation that Netflix and its patent counsel formed a trust does not allege a conspiracy because "an entity and its agents cannot form an antitrust conspiracy." (Def.'s Mot. 23.) This argument contradicts well-established Ninth Circuit case law. "An attorney is not immune from antitrust liability if he becomes an active participant in formulating policy decisions with his client to restrain competition." *Pinhas v. Summit Health*, Ltd., 894 F.2d 1024, 1033 (9th Cir. 1989) (Section 1 case, citing *Tillamook Cheese & Dairy Ass'n v. Tillamook County Creamery Ass'n*, 358 F.2d 115 (9th Cir. 1966)). This rule has continued vitality in the Ninth Circuit. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1156 (9th Cir. 2003) (applying *Tillamook* in Section 1 case); *Amarel*, 102 F.3d at 1522 (same; Section 1 and 2 case). Netflix relies on *F.B. Leopold Co., Inc. v. Roberts Filter Manufacturing Co.*, 882 F. Supp. 433 (W.D. Pa. 1995) to support its argument. *F.B. Leopold* distinguishes *Tillamook*, because it was not a Section 1 case. *Id*. at 447. Of course, this distinction does not carry the day against *Pinhas*. Given the Cartwright Act is broader than the Sherman Act, California courts would apply *Pinhas* and its progeny before *F.B. Leopold*.

---

[20] Obviously, this statement excludes Netflix's litigation against Blockbuster, which includes Netflix's claim on the '381 Patent. According to Netflix, no threat preceded Netflix's instant patent litigation, so there can no question that Netflix's serious regard with respect to the '381 Patent infects any other statements made to other competitors. (Def.'s Mot. 9.)

*Knevelbaard*, 232 F.3d at 1001 (California courts rely on federal cases on Sherman Act for "interpretive guidance" on the Cartwright Act). The extent of Netflix's patent counsel's involvement in this case is a matter of fact to be determined by the jury.

        **2.**    **The Complaint Adequately Alleges a Combination Between Netflix and its Competitors**

Further, Netflix's argument overlooks the proposition that the "combination" needed to support a Cartwright Act claim can be found where a defendant "by coercive conduct, imposes restraints to which [third parties] involuntarily adhere." *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 717-718, 187 Cal. Rptr. 797, 803 (Cal. Ct. App. 1982) (Cartwright Act liability based on involuntary restraint of trade). Certainly, if Netflix's competitors tacitly agreed to stay out of the Market, even involuntarily, this constitutes the "combination" needed to sustain Plaintiffs' Cartwright Act claim. Indeed, the Complaint alleges that Wal-Mart stopped competing in the Market, and began to "refer[] its customers to Netflix and [to] market[] (and continues to market) Netflix's services." (Compl. ¶ 60.) It is reasonable to infer from this allegation, *Simpson*, 452 F.3d at 1046, that Wal-Mart and Netflix entered into an agreement that Wal-Mart would cease competing in the Market. This is all that is needed to sustain the "combination" element of Plaintiff's Cartwright Act claim.

**IV.**    **Conclusion**

WHEREFORE, Plaintiffs pray that the Court deny Netflix, Inc.'s Motion to Dismiss.

Dated: May 24, 2007

By: /s/Alan Himmelfarb
    Alan Himmelfarb
    LAW OFFICES OF ALAN HIMMELFARB
    2757 Leonis Blvd
    Los Angeles, CA 90058
    Telephone: (323) 585-8696
    Fax: (323) 585-8198
    consumerlaw1@earthlink.net

Attorneys for Dennis Dilbeck, Plaintiff in
*Dilbeck v. Netflix, Inc.*, No. C 07-00643

Scott A. Kamber
Ethan Preston
KAMBER & ASSOCIATES, LLC
11 Broadway, 22d Floor
New York, NY 10004
Telephone: (212) 920-3072
Fax: (212) 202-6364
skamber@kolaw.com
epreston@kolaw.com

Richard A. Lockridge
Robert K. Shelquist
Yvonne M. Flaherty
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Telephone: (612) 339-6900
Fax: (612) 339-0981
rlockridge@locklaw.com
rkshelquist@locklaw.com
yflaherty@locklaw.com

Attorneys for Dennis Dilbeck, Plaintiff in
*Dilbeck v. Netflix, Inc.*, No. C 07-00643

Mary Jane Fait (admitted pro hac vice)
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
55 West Monroe Street, Suite 1111
Chicago, IL 60603
fait@whafh.com

Francis M. Gregorek
Rachele R. Rickert
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA  92101
rickert@whafh.com

Attorneys for Melanie Polk-Stamps and
Babacar Diene, Plaintiffs in *Polk-Stamps v.
Netflix, Inc.*, No. C 07-01266

Jayne A. Goldstein
MAGER & GOLDSTEIN LLP
1640 Town Center Circle, Suite 216
Weston, FL 33326
Telephone: (954) 515-0123
Fax: (954) 515-0124
jgoldstein@magergoldstein.com

Attorneys for Steven Dassa, Plaintiff in
*Dassa v. Netflix, Inc.*, Docket No. C 07-01978