**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NETFLIX ANTITRUST LITIGATION / | No. C 07-00643 WHA<br>Related to:<br>No. C 07-01266 WHA |
| This Document Relates To:<br>ALL ACTIONS / | No. C 07-01978 WHA<br>**ORDER GRANTING MOTION TO DISMISS** |

**INTRODUCTION**

In this putative antitrust class action, defendant Netflix, Inc., moves to dismiss plaintiffs' antitrust claims for lack of standing and for failure to state a claim. Plaintiffs have demonstrated that they have standing to bring a *Walker Process* claim. Defendant has shown, however, that plaintiffs have not pleaded a sufficient level of patent enforcement against Netflix's potential competitors, so plaintiffs' federal antitrust claims fail. Plaintiffs also bring state-law claims. To the extent that they are based on defendant's conduct before the Patent and Trademark Office, they are preempted by federal patent law. Plaintiffs' state-law claims fail because they have not pleaded any injury resulting from defendant's enforcing its patents. Accordingly, defendants' motion to dismiss is **GRANTED**. Limited discovery will be permitted, and plaintiffs will be given leave to file an amended complaint.

**STATEMENT**

Plaintiff Dennis Dilbeck resides in Los Angeles and has been a Netflix subscriber since October 2002 (Compl. ¶ 8). Plaintiffs in the two other actions consolidated with this action are also current Netflix subscribers.

Netflix operates an online DVD-rental service that claims 5.2 million subscribers (Compl. ¶ 9). It is headquartered in Los Gatos, California. Netflix obtained two patents on its online DVD-rental service that describe methods of ordering DVDs via the internet, but not transmitting them via the internet. Its first patent, United States Patent No. 6,584,450 (the '450 patent), issued on June 23, 2003. Its second patent, United States Patent No. 7,024,381 (the '381 patent), issued on April 4, 2006.

Netflix filed an application for the '450 patent on April 28, 2000. During prosecution, Netflix allegedly did not disclose *any* prior art references to the Patent and Trademark Office in connection with the application (*id*. at ¶ 19). While the '450 application was still pending, Netflix filed a continuation application on May 14, 2003. It ultimately issued as the '381 patent (*id*. at ¶ 17). After the '450 patent issued on June 23, 2003, Netflix allegedly flooded the PTO with over 100 references in support of the '381 application, none of which Netflix had disclosed in prosecuting the '450 patent (*id*. at ¶ 20). Plaintiffs allege that both maneuvers were done for the purpose of concealing material, non-cumulative prior art.

Plaintiffs also allege that Netflix purposefully withheld some material prior art references in conjunction with both applications (*id*. at ¶ 27). These included several patents owned by NCR Corporation, four of which issued prior to the filing of the '450 application, describing methods such as "Ordering and Downloading Resources from Computerized Repositories" and "Mechanism for Dependably Organizing and Managing Information for Web Synchronization and Tracking Among Multiple Browsers" (*id*. at 28). Netflix initiated a declaratory-judgment action against NCR seeking a declaration of non-infringement in March of 2006. *Netflix, Inc. v. NCR Corp.,* CV No. 06-1892 EDL. That action was dismissed on June 23, 2006. Plaintiffs allege that Netflix was aware of these patents at least as of 2003 and had a reasonable apprehension of suit sufficient to sustain a declaratory-judgment action. Plaintiffs

1  also allege that Netflix withheld other material, non-cumulative prior art references from the
2  PTO, including references describing subscription libraries, pay television services, and other
3  prior art drawn to selecting and ordering items on the internet (*id*. at ¶ 30).

4  One of Netflix's competitors, Blockbuster, Inc., launched its own online DVD-rental
5  service in August 2004, after the '450 patent had issued and while the application for the '381
6  patent was still pending (*id*. at ¶ 58). In January 2005, Reed Hastings, Netflix's chief executive
7  officer, and Edward Stead, Blockbuster's then-executive vice president, purportedly met.
8  During that meeting, Hastings allegedly "praised Blockbuster's competitive position in the
9  online rental business and asked Stead when he had figured out that Netflix's '450 patent was a
10 'joke'" (*id*. at ¶ 45). Netflix then filed a patent-infringement action against Blockbuster when
11 the '381 patent issued on April 4, 2006. Netflix allegedly knew that the litigation was
12 objectively and subjectively a sham (*id*. at ¶ 48–49). Plaintiffs also allege that Blockbuster was
13 "ready, willing, and able" to enter the market before August 2004, but "delayed entering into
14 the Relevant Market after learning of the '450 patent until August 2004" (*id*. at ¶ 59).

15 Allegedly, Wal-Mart Stores, Inc., competed in the online DVD-rental market from June
16 2004 to June 2005 (*id*. at ¶ 60). Dilbeck's counsel inquired about Wal-Mart's exit from the
17 market with an attorney in Wal-Mart's legal department. The only answer received was that the
18 company does not publicly discuss its business dealings (*ibid*.). On information and belief,
19 Dilbeck alleges that Wal-Mart withdrew from the relevant market after Netflix alerted it to the
20 '450 patent to induce it to exit the market (*id*. at ¶ 61). He bases this belief on his allegation
21 that "Wal-Mart is not the shrinking violet of our national economy" and that it is unlikely that
22 Wal-Mart would withdraw of its own accord (*ibid*.).

23 Plaintiffs also allege that Amazon.com, Inc. could have entered the market but was
24 induced not to enter. Hastings' announcement that Amazon planned to enter the market in
25 October 2004 led to a 41% drop in Netflix's stock valuation (*id*. at ¶ 62). Amazon did not end
26 up entering the market in the United States; it instead introduced a similar service in the United
27 Kingdom and Germany starting in August 2006 (*ibid*.). As with Wal-Mart, Amazon's legal
28 department did not respond to plaintiffs' inquiries (*ibid*.). Based on these circumstances, "[o]n

information and belief, Dilbeck alleged that 1) Amazon learned of Netflix's '450 Patent either by its own efforts or by Netflix's effort, and 2) made the decision to enter the Relevant Market outside the United States, but 3) discarded its plans to enter the Relevant Market in the United States in August 2004 because of the '450 Patent" (*id*. at ¶ 63).

On April 4, 2006, the same day that the '381 patent issued, Netflix filed an action for patent infringement against Blockbuster. Blockbuster's answer included defenses of inequitable conduct and patent misuse and counterclaims for monopolization and attempted monopolization under Section 2 of the Sherman Act. Dilbeck filed a motion to intervene as a consumer in Blockbuster's antitrust counterclaims on October 11, 2006. His motion was denied on December 7, 2006. On April 26, 2007, Netflix and Blockbuster filed a notice of stipulated dismissal of Blockbuster's antitrust counterclaims.

On January 31, 2007, plaintiff Dennis Dilbeck filed this action alleging violations of Section 2 of the Sherman Act, California's Cartwright Act, and California's unfair competition law. Two additional complaints were later filed by plaintiff Melanie Polk-Stamps on March 2, 2007, and by plaintiff Steven Dassa on April 6, 2007. All three actions were consolidated. On April 20, 2007, plaintiffs designated Dilbeck's complaint as the operative consolidated complaint. Discovery was stayed on April 26, 2007. Defendant was allowed to proceed with its motion to dismiss.

**ANALYSIS**

A motion to dismiss under Rule 12(b)(6) tests for legal sufficiency of the claims alleged in the complaint. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964–65 (May 21, 2007). "All allegations of material fact are taken as true and construed in the light most favorable to plaintiff. However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

4

### 1. *WALKER PROCESS* CLAIM.

"As a general rule, behavior conforming to the patent laws oriented towards procuring or enforcing a patent enjoys immunity from the antitrust laws." *Unitherm Food Sys., Inc. v. Swift Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004), *rev'd in part on other grounds*, 546 U.S. 394 (2006). "But this immunity is hardly absolute. Nearly forty years ago, the Supreme Court recognized that an inventor who obtains a patent by defrauding the patent office deserves no immunity." *Ibid*. Such antitrust claims are known as *Walker Process* claims, referring to the Supreme Court's decision in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 176 (1965). In order to "'achiev[e] a suitable accommodation in this area between the differing policies of the patent and antitrust laws,' a distinction must be maintained between patents procured by 'deliberate fraud' and those rendered invalid or unenforceable for other reasons." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069 (Fed. Cir. 1998) (quoting *Walker Process*, 382 U.S. 178–790 (Harlan, J., concurring)).

To succeed on a claim for *Walker Process* fraud, the antitrust claimant must show:

> (1) that the asserted patent was obtained by knowingly and willfully misrepresenting the facts to the PTO;
>
> (2) that the party enforcing the patent was aware of the fraud when bringing suit;
>
> (3) independent and clear evidence of deceptive intent;
>
> (4) a clear showing of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission; and
>
> (5) the necessary additional elements of an underlying violation of the antitrust laws.

*Nobelpharma*, 141 F.3d at 1068–71.

Generally, the law of the circuit in which the district court sits governs issues in antitrust law. Federal Circuit law controls as to matters within its jurisdiction. More specifically, "whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law." *Nobelpharma*, 141 F.3d at 1068. "When . . . the courts consider a patentee's behavior under Federal Circuit law and determine that it involved either an inappropriate attempt to procure a

5

patent or an inappropriate attempt to enforce a patent, the remainder of the antitrust inquiry must proceed under the law of the regional circuit." *Unitherm*, 375 F.3d at 1357.

### A. Standing.

A plaintiff must be a "proper party" to have standing to bring an antitrust action, regardless of whether they have suffered an antitrust injury in fact. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110–11, nn. 5, 6 (1986). A plaintiff must show five factors to demonstrate antitrust standing: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996) (citing *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983).

The first factor, antitrust injury, consists of the following elements: "(1) unlawful conduct, (2) causing an injury to plaintiffs, (3) that flows from that which makes the conduct unlawful, (4) that is of the type the antitrust laws were intended to prevent" and (5) that the plaintiff "be a participant in the same market as the alleged malefactors." *Glen Holly Ent'mt., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003). Here, plaintiffs have alleged that Netflix fraudulently obtained a patent, which it then used to keep competitors out of the market. Plaintiffs were injured by the monopolistic overcharges Netflix could exact absent competition. Consumers were participants in the same market because they purchased Netflix's products. Assuming plaintiffs successfully plead unlawful conduct, they have shown that they have suffered an antitrust injury.

Defendant argues that consumers' injuries would be too remote from the alleged patent fraud, that is, the fraud's true target was competitors, not consumers. Where the defendant's actions were targeted at its competitors, however, consumers still may have standing to sue for their antitrust injuries. *See, e.g., Blue Shield of Virginia v. McCready*, 457 U.S. 465, 478–79 (1982). Here, plaintiffs have alleged that their injuries flow from Netflix's having asserted its patents to keep competitors out of the market. Absent Netflix's enforcement of its

6

fraudulently-procured patents, plaintiffs would not be harmed, or so the argument goes. This alleged injury is not so remote as to bar the courthouse doors against consumers.

As to the remaining factors, the speculative measure of the harm is quite straightforward, at least for pleading purposes. Netflix exacted a monopolistic overcharge from its subscribers. Netflix allegedly dropped its prices by a significant amount when Blockbuster entered the market as a competitor. The risk of duplicative recovery is small because consumers have a different measure of damages than competitors. Consumers' damages come from paying a supracompetitive price, while competitors' damages are measured by foregone profits. *Andrx Pharm., Inc. v Biovail Corp. Int'l*, 256 F.3d 799, 817 (D.C. Cir. 2001). Because measures of damages are different, complexity in apportioning damages becomes minimal.

Netflix argues that consumers, even where they are direct purchasers, do not have standing to bring *Walker Process* claims. Consumers' injuries, defendant contends, are simply too far removed from the fraud allegedly committed by the defendant on the patent office and defendant's subsequent enforcement of the patent. The Ninth Circuit has recognized the rule that only those potential competitors who are ready to enter the market may have standing to bring *Walker Process* claims. *Bourns, Inc., v. RayChem Corp.*, 331 F.3d 704, 711–12 (9th Cir. 2003). In that decision, the plaintiff lacked standing because it had not shown that it was prepared to enter the market at the time the patent was asserted against it. The plaintiff in *Bourns* did not suffer injury because it was not in the market or prepared to enter the market. The *Bourns* decision did not squarely address the question of consumer standing. Neither party presents any appellate authority on the precise question of whether purchasers have standing to assert a *Walker Process* claim, and the Court found none. Nor has any decision from this Court been found on the subject.

Defendant cites several district court decisions. All involve allegedly anti-competitive practices, such as collusive patent-infringement settlements or attempts to game the FDA's generic drug approval process, in connection with pharmaceutical patents. In *In re DDAVP Direct & Indirect Purchaser Antitrust Litig.*, No. 05-2237, slip op. at 12 (S.D.N.Y. 2006), a district court dismissed the consumers' *Walker Process* claims for lack of standing. The Court

1  held that since the patents were not asserted or threatened to be asserted against them, they
2  lacked standing. A similar conclusion was reached in *In re Ciprofloxacin Hydrochloride*
3  *Antitrust Litig.*, 363 F. Supp. 2d 514, 547 (E.D. N.Y. 2005), however, the holding to dismiss the
4  consumers' *Walker Process* claims was actually predicated on a failure to allege enforcement
5  activity. Two additional decisions reached the conclusion that consumers lacked standing to
6  bring *Walker Process* claims because consumers did not suffer the kind of antitrust injury that
7  *Walker Process* claims were meant to address. *In re Remeron Antitrust Litig.*, 335 F. Supp. 2d
8  522, 529 (D. N.J. 2004); *In re K-Dur Antitrust Litig.*, No. 01-1652, slip op. at 24–30 (D. N.J.
9  Mar, 1, 2007) (Netflix's App. Exh. 5). Finally, Judge Posner, sitting by designation, held that
10 because the fraud at issue in a *Walker Process* claim was directed at a patentee's competitors,
11 suppliers of inactive pharmaceutical ingredients for those competitors lacked standing. *Asahi*
12 *Glass Co. v. Pentech Pharm., Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003). The supplier's
13 injuries were too remote to support standing.

14      A single district court decision has held that consumers had standing to bring *Walker*
15 *Process* claims. That decision held that *Walker Process* claims are properly viewed as antitrust
16 claims, so standing under them should be viewed in the same way as well. *Molecular*
17 *Diagnostics Labs. v. Hoffman-LaRoche, Inc.*, 402 F. Supp. 2d 276, 280 (D. D.C. 2005). In
18 reaching this conclusion, the district court stated that "[i]f one believes that one of the primary
19 purposes of a treble damages action is deterrence, then increasing the number of parties
20 scrutinizing the actions of potential monopolists will further that goal." *Id.* at 281.
21 Furthermore, that decision also recognized that the harm in a *Walker Process* claim comes not
22 from fraudulently obtaining a patent, it comes from creating or maintaining an unlawful
23 monopoly using that patent. This order finds *Molecular Diagnostics* persuasive. Even though
24 *Walker Process* claims are predicated on enforcement of a fraudulently-obtained patent, the
25 harm still accrues directly to consumers. Competitors are excluded from the market allowing
26 the patentee to create or maintain an unlawful monopoly. Accordingly, if plaintiffs can plead
27 the other elements of their *Walker Process* claim, they have standing.

28

### B. Fraud and Rule 9(b).

"Like all fraud-based claims, *Walker Process* allegations are subject to the pleading requirements of Fed. R. Civ. P. 9(b)." *Medimmune, Inc. v. Genentech, Inc.*, 427 F.3d 958, 967 (Fed. Cir. 2005). "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." FRCP 9(b); *see also Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003). Plaintiffs must identify with particularity the reference or group of references that, but for their omission from Netflix's patent applications, the PTO would not have granted the applications. *See, e.g., Grid Sys. Corp. v. Texas Instruments Inc.*, 771 F. Supp. 1033, 1039 (N.D. Cal. 1991) (for *Walker Process* claims, a party must allege that "but for the fraud the affected patents would not have issued"). A party need not plead the intent element of its *Walker Process* claim with particularity. Instead, "it is the 'circumstances' constituting the fraud that must be alleged with specificity." *Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1149 (N.D. Cal. 2003).

Here, plaintiffs have identified the references that Netflix allegedly withheld from the PTO in prosecution — the NCR patents. For purposes of this motion, plaintiffs have alleged that Netflix was aware of the NCR patents' existence. Indeed, Netflix filed a declaratory-judgment action against NCR. In that complaint, Netflix alleged that NCR had sent notice as early as January 2003 that Netflix infringed some of NCR's patents (Compl. ¶ 34). Plaintiffs have also pleaded that but for the NCR references being withheld, the '450 patent and the '381 patent would not have issued. In doing so, they have identified parallels between the NCR patents and Netflix's applications that indicated that the NCR patents were material. Plaintiffs also point out that Netflix submitted no prior art references to the examiner in connection with the '450 patent. Plaintiffs have pleaded with sufficient particularity that but for the fraud, the patents would not have issued.

### C. Level of Enforcement.

To plead a claim of *Walker Process* fraud, plaintiffs must plead that the fraudulently-procured patent was enforced; merely procuring a patent by fraud is not sufficient. *Unitherm*,

9

375 F.3d at 1355. If a plaintiff cannot plead the minimum level of enforcement necessary to sustain a declaratory judgment action, the plaintiffs likewise cannot plead a *Walker Process* claim. *Id*. at 1357–58. To determine standing in declaratory judgment actions, the Federal Circuit formerly used a "reasonable apprehension of suit" standard. *Id*. at 1358. The Supreme Court recently criticized this standard in *Medimmune Inc. v. Genentech, Inc.*, 127 S.Ct. 764, 771–72 (Jan. 9, 2007). Thereafter, the Federal Circuit held that "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without a license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. Mar. 26, 2007). "In the context of conduct prior to a existence of a license, declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee." *Id*. at 1380–81.

Plaintiffs allege that Netflix deterred three of its potential competitors from entering the market using the '450 patent: Wal-Mart, Amazon, and Blockbuster. Plaintiffs' allegations as to Wal-Mart and Amazon are similar. Wal-Mart introduced its own online DVD-rental service in June 2004. It exited the market in June 2005. Amazon announced plans to start its own service in October 2004, but ended up not doing so. It later started a similar service in the United Kingdom and Germany in August 2006. As to both companies, plaintiffs allege that they either exited the market or declined to enter the market, the '450 patent was in existence at the time, so they must have known about it. The '450 patent must have deterred them from competing.

Plaintiffs' allegations as to Wal-Mart and Amazon fail for two reasons. First, plaintiffs' bare-bones allegations that Wal-Mart and Amazon were aware of the '450 patent do not support the inference that they declined to enter the market or exited the market because Netflix threatened to assert it against them. They may have decided that barriers to entry were too high, they may have decided to focus on other parts of their business, or they may have decided not to

10

1  enter the market for any number of other reasons. Simply pleading that the '450 patent was in
2  existence, so Wal-Mart and Amazon surely must have known about it, does not support the
3  inference that they exited because Netflix was threatening enforcement against them. Plaintiffs
4  have pleaded no facts supporting an inference of any action taken by Netflix toward Wal-Mart
5  or Amazon, so they have not pleaded a sufficient level of enforcement. Second, taking
6  plaintiffs allegations as true, defendant's "alerting" Amazon and Wal-Mart to the existence of
7  the '450 patent is not sufficient under the standards set out by the Federal Circuit. Merely
8  notifying them to the existence of the patent, without any threat or implication at all that they
9  must either stop practicing the patented method or risk Netflix's filing suit, would not meet the
10 minimum standard for sustaining an action for declaratory judgment. In turn, these allegations
11 could not form the basis of a *Walker Process* claim. Enforcement requires some affirmative act
12 which is lacking in the pleadings.
13    As to Blockbuster, plaintiffs first allege that because Blockbuster did not enter the
14 market until August 2004, the presence of the '450 patent must have delayed Blockbuster's
15 entry. Specifically, plaintiffs allege (Compl. ¶ 58):

> The only reasonable inference drawn from Blockbuster's allegation [in its antitrust counterclaim against Netflix] that Netflix's CEO asked Blockbuster's general counsel when he "figured out" that the '450 patent was a "joke" is that Blockbuster delayed its entry into the relevant market because of the '450 Patent, at least for as long as it took Blockbuster to "figure[] out" that the '450 Patent was "a joke."

20 Plaintiffs attempt to draw the inference from the meeting between Blockbuster's general
21 counsel and Netflix's CEO that there was enforcement activity at some time before that
22 meeting. The timing does not work. That meeting allegedly took place in January 2005.
23 Blockbuster had already entered the market in August 2004. Hastings' alleged statements are
24 not sufficient to support an inference of enforcement activity nearly two years before those
25 statements were made. At most, this allegation supports an inference that Blockbuster knew of
26 the '450 patent, not an inference that Netflix attempted to enforce it against Blockbuster.
27 Additionally, Blockbuster, in its own antitrust counterclaims against Netflix, alleged that
28

11

1 Netflix had given it no warning that Netflix believed that Blockbuster infringed their patents
2 until Netflix filed a complaint.

3 Next, plaintiffs identify the patent-infringement action Netflix filed against Blockbuster
4 on April 4, 2006, as enforcement action. It is undisputed that actually filing a patent-
5 infringement complaint constitutes sufficient enforcement activity. Also undisputed is that
6 Blockbuster entered the market in August 2004. Plaintiffs so pleaded (Compl. ¶ 58). Thus, to
7 the extent that plaintiffs allege that the lawsuit delayed Blockbuster's entry into the market, they
8 cannot do so. Blockbuster had already entered the market nearly two years before the action
9 was filed and has never left it.

10 Plaintiffs next argue that their claim is based Netflix's action against Blockbuster
11 deterring *other* competitors from entering the relevant market. Other than its previous
12 allegations regarding Amazon and Wal-Mart, plaintiffs do not identify who these potential
13 competitors might have been or what actions Netflix took against them. Perhaps plaintiffs
14 could have pleaded that Amazon's decision to enter the European market but not the domestic
15 market could have been based on Netflix's actions. They would still have to plead, however,
16 that Netflix took some kind of enforcement action against Amazon to maintain a *Walker*
17 *Process* claim. Plaintiffs could possibly plead that Netflix's lawsuit against Blockbuster may
18 have deterred Blockbuster from fully entering the market or practicing all aspects of the
19 patented method. This in turn could have prevented Blockbuster from competing effectively
20 with Netflix. This theory is not developed in the pleadings. Plaintiffs simply allege that
21 potential competitors' awareness of Netflix's patents deterred competition. Plaintiffs have not
22 alleged that Netflix enforced or attempted to enforce its patents to unlawfully create or maintain
23 a monopoly. Accordingly, defendant's motion to dismiss is **GRANTED**, and this claim must be
24 **DISMISSED**. Plaintiffs will be granted leave to amend.

25     **2.**    **STATE-LAW CLAIMS.**

26 Plaintiffs' complaint includes claims for violations of California's Cartwright Act, Cal.
27 Bus. & Prof. Code §§ 16720 and 16726, and for injunctive and restitutionary relief under
28 California's unfair competition law, Cal. Bus. & Prof. Code § 17200. Defendant first argues

that plaintiffs lack standing to bring these claims. Because this order has already determined that plaintiffs have standing under the federal antitrust laws if plaintiffs can demonstrate antitrust injury, consumers such as plaintiffs have standing to bring these claims under California law.

### A.   Preemption.

Netflix first argues that plaintiffs' state law claims are preempted by federal patent law. "Federal Circuit law governs whether federal patent law preempts a state law claim." *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1376 (Fed. Cir. 2005) (citing *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1361 (Fed. Cir. 1999)). Claims that are predicated on no more than bad-faith misconduct or fraud before the PTO or that are identical in scope to an inequitable conduct defense are preempted by federal patent law. *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1382 (Fed. Cir. 2000). Tort claims under state law are not preempted by federal patent law where they include additional elements not found in federal patent law claims. *Dow Chemical Co. v. Exxon Corp.*, 139 F.3d 1470, 1473 (Fed. Cir. 1998).

Plaintiffs may not predicate their state-law claims solely on Netflix's allegedly having obtained its patents through fraud. Conduct in front of the PTO is regulated by federal patent laws. To the extent that plaintiffs so plead, their claims are preempted by federal patent law. Plaintiffs contend that they "would recover under their California-law claims if the jury found they had proved . . . that Netflix's conduct before the Patent Office was inequitable and in bad faith, but their evidence fell short of actual fraud" (Opp. at 19–20). Plaintiffs are wrong. Absent proof of some other element, plaintiffs would merely be showing that Netflix engaged in misconduct before the PTO. At most, that would be a claim for inequitable conduct. Such claims are preempted by federal patent law. For the state-law claims to survive, some element other than misconduct or fraud before the PTO is needed.

Plaintiffs then argue that they have met the requirement for an additional element because they have alleged that Netflix "deterred" its potential competitors from entering the market using its ill-gotten patents. As with the federal claims, plaintiffs have failed to plead

13

conduct by Netflix that would have deterred its competitors from entering. Plaintiffs have failed to allege any enforcement activity against potential competitors Wal-Mart or Amazon. As to Blockbuster, plaintiffs have perhaps alleged that Netflix's patent-infringement action against them was brought in bad faith, however, they have failed to plead any antitrust injury as a result of that action. Blockbuster entered the market in August 2004, it never left the market, and plaintiffs have not pleaded that there was any adverse effect on the market from defendant's actions to Blockbuster. Accordingly, at this point, plaintiffs have failed to plead state-law claims that are not preempted by federal law. For purposes of plaintiffs' Section 17200 claim, they have failed to plead conduct outside of fraudulently obtaining a patent that would constitute unfair competition.

### B. Cartwright Act Claim.

Plaintiffs assert a claim under California's Cartwright Act, which makes unlawful any agreements or trusts having the effect of restraining trade. Cal. Bus. & Prof. Code §§ 16720, 16726. By the statute's own terms, a trust is a "combination of capital, skill or acts by two or more persons." Cal. Bus. & Prof. Code 16720. Attorneys and employees are generally considered agents and not co-conspirators, however, "[a]n attorney is not immune from antitrust liability if he becomes an active participant in formulating policy decisions with his client to restrain competition." *Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024, 1033 (9th Cir. 1989).

Allegedly, the "Netflix Patent Applicants," including Netflix, its employees, and its patent counsel Edward A. Becker and Hickman Palermo Truong & Becker LLP, formed a trust for the purpose of restraining trade (Compl. ¶¶ 100–102). As discussed above, these allegations of conspiracy are preempted by federal patent law to the extent that this alleged conspiracy was created solely to commit fraud on the PTO. There is no allegation that Becker or the Hickman firm helped Netflix actually assert its fraudulently-obtained patents. Nor is such an inference supported by the pleadings. Furthermore, plaintiffs have not pleaded facts that would support the inference that Becker or the Hickman firm was an active participant in formulating policy decisions related to enforcing the patents. In the pleadings, Becker's involvement is limited to

14

patent prosecution. Accordingly, plaintiffs' theory that Netflix and its patent prosecution counsel were in a conspiracy fails.

Cartwright Act claims are properly dismissed "where the complaint makes conclusory allegations of a combination and does not allege with factual particularity that separate entities maintaining separate and independent interests combined for the purpose to restrain trade." *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 189 (1999). In their opposition brief, plaintiffs for the first time advance the theory that Netflix and its competitors were in a tacit but unwilling conspiracy to restrain trade. Specifically, plaintiffs point to their allegation that "[w]hen Wal-Mart discontinued offering services in the Relevant Market, it referred its customers to Netflix and marketed (and continues to market) Netflix's services" (Compl. ¶ 60). In their opposition, plaintiffs argue that this allegation would lead to the inference that there was an unlawful agreement between the two entities. This allegation is simply too conclusory. Plaintiffs' allegation does not support the conclusion that Netflix and Wal-Mart entered into an agreement to restrain trade. The complaint hints at the possibility, but that is not sufficient even at the pleading stage. Furthermore, it is not clear whether plaintiffs allege that Netflix used its patent position to get Wal-Mart to agree to leave the market, or if plaintiffs allege that Wal-Mart just agreed to stay out of the market.

Because plaintiffs have failed to plead state-law claims, this order does not reach the issue of whether plaintiffs' claims were barred by California's litigation privilege. Accordingly, defendant's motion to dismiss is **GRANTED** as to plaintiffs' Cartwright Act and unfair competition claims. Plaintiffs will be granted leave to amend.

### 3. STAY OF DISCOVERY.

An order dated April 26, 2007, stayed discovery in this action. District courts have broad discretion to stay discovery pending the resolution of a potentially dispositive motion, including a motion to dismiss. *Jarvis v. Regan*, 833 F.2d 149, 155 (9th Cir. 1987). Recently, the Supreme Court has recognized that staying discovery may be particularly appropriate in antitrust cases, where discovery tends to be broad, time-consuming and expensive. *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1967 (May 21, 2007). The Supreme Court pointed out that

"determining whether some illegal agreement may have taken place between unspecified persons at different [companies] . . . at some point over seven years is a sprawling, costly, and hugely time-consuming undertaking . . . ." *Id.* at n.6.

In this action, discovery could indeed prove expansive if allowed to proceed. Plaintiffs' claims have been dismissed because they have failed to plead the requisite level of enforcement to sustain a *Walker Process* claim. At this stage, however, discovery should remain stayed except for a specific narrowly-tailored request. Unlike in *Twombly*, the players are known at least in the general sense — Netflix, Wal-Mart, Amazon, and Blockbuster. The subject-matter of communications relevant to plaintiffs' *Walker Process* allegations is narrow as well — communications regarding the '450 patent and the '381 patent. Accordingly, narrowly-tailored discovery will be permitted to go forward.

Discovery in this action remains stayed with the following exception. Netflix is ordered to disclose all documents summarizing, describing, referring to or constituting written or oral communications between Netflix (or a representative), on one hand, and Wal-Mart or Amazon (or a representative), on the other hand, on the subject of the patents in suit (or either or them) from the date of issuance of the patents in suit (or either or them) to the filing of the complaint in this action. These are to be produced no later than **JULY 2, 2007**. Plaintiffs should file their amended complaint no later than **JULY 16, 2007**.

## CONCLUSION

For all of the above-stated reasons, defendants' motion to dismiss is **GRANTED**. Plaintiffs will be granted leave to amend their complaint. Discovery remains stayed except for the narrow request described above.

**IT IS SO ORDERED.**

Dated: June 14, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

16